Irving A. **BACKMAN**, et al.,
**Plaintiffs, Appellees,**

v.

**POLAROID CORPORATION,**
**Defendant, Appellant.**

Irving A. **BACKMAN**, et al.,
**Plaintiffs, Appellants,**

v.

**POLAROID CORPORATION,**
**Defendant, Appellee.**

**Nos. 89–1171, 89–1172.**

United States Court of Appeals,
First Circuit.

Reheard May 9, 1990.

Decided Aug. 2, 1990.

See also 677 F.Supp. 50.

John R. Hupper, with whom Frederick A.O. Schwarz, Jr., James L. Buchal, David E. Sternberg, Cravath, Swaine & Moore, James E. Tolan, William K. Dodds, Rodney M. Zerbe, Olwine, Connelly, Chase, O'Donnell & Weyher, Stephen D. Poss and Goodwin, Procter & Hoar, were on brief, for Polaroid Corp.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Patrick W. Hanifin and New England Legal Foundation, on brief, for Associated Industries of Mass. and the New England Foundation, amici curiae.

Stanley Keller and Palmer & Dodge, on brief, for Business Law Section of Boston Bar Ass'n, amici curiae.

John D. Donovan, Jr., Mark P. Szpak and Ropes and Gray, on brief, for New England Corporate Counsel Ass'n and American Corporate Counsel Ass'n (Northeast Chapter), amici curiae.

Thomas G. Shapiro, with whom Carolyn Grace, Shapiro, Grace & Haber, Richard B. Dannenberg, David C. Harrison, Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C., Ronald Litowitz, Bernstein Litowitz Berger & Grossmann, Arthur N. Abbey, and Abbey & Ellis, were on brief, for Irving A. Backman, et al.

Before BREYER, Chief Judge, ALDRICH, Senior Circuit Judge, CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, TORRUELLA, SELYA and CYR, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

This is a class action brought by Irving A. Backman on behalf of himself and all other persons who purchased shares of stock of defendant Polaroid Corporation on the open market between January 11 and February 22, 1979, allegedly misled by defendant's conduct that violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the regulations promulgated thereunder. Suit was filed in June, 1979. The case came on for trial, on a second amended complaint, in June, 1987, by which time the docket showed 363 entries. The improprieties asserted, both in the complaint and in plaintiffs' opening to the jury, as responsible for plaintiffs' purchasing shares before a substantial drop in the market, were defendant's failure to dis-

close unfavorable facts about its new product, Polavision, an instant movie camera. Following trial on liability, the jury found for plaintiffs. Defendant moved for judgment n.o.v., or, alternatively, for a new trial, but the court denied both motions. On appeal, a divided panel affirmed as to the former, but granted a new trial. On this rehearing en banc we reverse, and order judgment for defendant.

### THE FACTS AND THE LAW: PHASE ONE

While we have been surprised before, we have never been so reminded that, no matter how fully expressed, our opinions do not always command response. In their amended complaint plaintiffs alleged that defendant failed to disclose that Polavision, introduced in the spring, had been unprofitable throughout 1978, and would continue so, significantly, at least through 1979; that it had been excessively inventoried and had suffered lagging sales; that little, if any, information had been made public; that defendant knew that this undisclosed information was material to investors, and that major investment research firms had publicly projected defendant's earnings based on assumptions defendant knew were contrary to the true facts, all of which non-disclosure was in violation of the securities laws.

Secondly, plaintiffs re-alleged the above, and added that over the years defendant had advertised that it was a growth company, and that, through its successes, the investment community had come to consider it the best of the growth companies, and that its failing to make the above disclosures operated as a fraud and deceit on the investing public, was a "fraud on the market," and constituted an unlawful manipulation thereof.

Defendant moved to dismiss on the ground that the complaint did not state a cause of action. This motion was denied. We have not reviewed the possible correctness of that ruling as of that date, but later it became clearly incorrect. In March, 1987, three months before trial, we decided *Roeder v. Alpha Industries, Inc.*, 814 F.2d

22 (1st Cir.1987). In that case officers of the defendant bribed an employee of a defense contractor in order to obtain a subcontract. When it was learned that its officers were about to be indicted, defendant released that information to the public. Plaintiff brought a class action on behalf of himself and others who had purchased stock on the market following the bribery, but before the announcement, claiming that its non-disclosure was a violation of the securities laws. The district court dismissed, holding that although there was a duty to disclose material facts, there were no material facts to disclose until an indictment became probable, and that, as to this, defendant acted promptly. We affirmed, but rejected the court's reasoning. Rather, the fact of the bribery itself "reasonable investors might have considered ... to be important information they would want to have before they made their investment decisions." 814 F.2d at 25. However, mere market interest is no basis for imposing liability. We said, at page 26,

> The materiality of the information claimed not to have been disclosed ... is not enough to make out a sustainable claim of securities fraud. Even if information is material, there is no liability under Rule 10b–5 unless there is a duty to disclose it.

> A duty to disclose "does not arise from the mere possession of non-public information." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980).

Continuing, at pages 27–28,

> Roeder claims that a corporation has an affirmative duty to disclose all material information even if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures. The prevailing view, however, is that there is no such affirmative duty of disclosure....

> Roeder relies on the "fraud on the market" theory, which has been employed by a number of courts in nondisclosure cases, for his argument that

there is an affirmative duty to disclose material information to the public. [cit. omitted] Contrary to Roeder's claim, the fraud on the market theory has nothing to do with an affirmative duty to disclose material information. It only addresses ... reliance.... In every fraud on the market case Roeder cites, there was a duty to disclose because of misleading reports or statements....

In sum, Roeder's complaint does not allege facts that, if proved, would establish Alpha had a duty to disclose the alleged illegal payments.

It would seem difficult to find language, or a holding, that more closely tracked, and completely invalidated, both aspects of plaintiffs' complaint. Notwithstanding, in total disregard, plaintiffs' opening, trespassing at length on the court's own prerogative, informed the jury that the law was that it could find an unfulfilled duty to disclose if it found that what defendant failed to disclose about Polavision would have been material to the investing public.[1] At the side bar, at the close of the opening, defendant correctly pointed out that there had been no indication that defendant had traded in its own stock, or had made a misrepresentation, or had violated any reporting requirements, and moved for a directed verdict pursuant to *Roeder*, of which it had previously given the court a copy. The court, unhappily, failed to see that plaintiffs' case was dead on arrival, and denied the motion without comment.

Nor did *Roeder* stimulate plaintiffs to change their tack, and meet *Roeder*, by claiming "inaccurate, incomplete, or misleading prior disclosures." Rather, in a

twelve day trial, they precisely followed their opening, alleging, simply, nondisclosure of material information. As summarized in their final argument,

> Polaroid ... violated the federal securities laws which require full disclosure so that people who purchase and sell securities do so on a fair playing field; that people have the same information and people can make their investment decisions based on having all of the information and having truthful information.... [Y]ou have to find that Polaroid had adverse information, that information was material—i.e., that it was important— and that Polaroid knowingly and deliberately withheld it. *And that's all we're asking you to do here.* (Emphasis supplied).

The summation was not an inadvertence, but was in accord with plaintiffs' own testimony.

> Q. Now, Mr. Backman, in this action you are not claiming, are you, that the financial information put out by Polaroid was in any way false and misleading, are you?
>
> A. I think you'll have to refer to the complaint. I believe the failure to disclose is just as improper as providing false information. And I believe the essence of my suit deals with the failure to disclose.... I do claim it was false and misleading because the failure to disclose is just as misleading a (sic) improper disclosure.

This, of course, is not so. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Chiarella, ante.*[2]

1. E.g., "The idea [of the law] is that there should be full disclosure so that everyone has all of the relevant facts, that the marketplace has the relevant facts concerning a particular stock. And then, being fully informed, people can make their judgments."

2. In spite of these positive statements, the dissent, in n. 6, maintains that "plaintiffs' theory consistently has been that Polaroid's failure to disclose information misled investors." The dissent's quotation of plaintiffs' listings of non-disclosed facts, however, makes full sense in terms of simple non-disclosure as distinguished from misleading. But lest there be doubt we note

that plaintiffs expressly requested that the jury be instructed that their claims were other than of being misled by untrue or incomplete statements.

### REQUEST TO CHARGE NO. 7
*Explanation of Rule 10b–5*

The Class' claims arise under Section 10(b) of the 1934 Act, and 10b–5 of the Securities and Exchange Commission, which has the force of law. Rule 10b–5 provides that it is unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud,

Plaintiffs' summation was followed by the court's charge, equally contrary to *Roeder*.[3]

## TRANSITION

We have gone into this at length, not so much to show the emptiness of plaintiffs' first claim—agreed to by the full panel—but to accent our finding that there had been no falsity or misleading by defendant in any respect. In eight years of preparation and twelve days of trial, the words misrepresentation and misleading never crossed plaintiffs' lips, even when challenged by defendant's citation of *Roeder*, except to deny that they were claimed. Surely in plaintiffs' four law firms, there must have been someone who read *Roeder* with dismay, and called attention to the escape route. The inference seems manifest that to shift to a claim of misrepresentation and misleading seemed even less hopeful than to stay where they were.

Finally facing up to the problem of *Roeder*, plaintiffs, on defendant's appeal to the panel, used these words thirty-two times. "Polaroid's third quarter 1978 report [issued in early November] contained material misrepresentations...." "Polaroid's representations in its third quarter report were misleading in November, and blatantly false by the end of Polavision's critical Christmas season." These facts are so clear, plaintiffs now tell us, "This rehearing petition should never have been filed."

Before the panel, defendant protested that this was a total variance. Taking the position that on a motion for a directed verdict the test is what the record permitted, not what was claimed, the panel opinion overruled the protest. Defendant now seeks to renew what would seem, on this record, a reasonable complaint. It is not however, before us. Counsel's obligatory certification accompanying the petition for rehearing and suggestion for rehearing en banc made no mention of it. Presumptively, this was waiver. *Cf. Irvine v. California*, 347 U.S. 128, 129, 74 S.Ct. 381, 381, 98 L.Ed. 561 (1954) ("We disapprove of the process of smuggling additional questions into the case after we grant certiorari."). In its en banc brief defendant devotes four pages to the alleged impropriety of plaintiffs' "switching theories" on appeal, and, correspondingly, consumed a substantial portion of its limited time for oral argument. Ironically, if found justified, this would moot the questions for which defendant had sought, and we had granted, review. A party should not address a petition to an important question and then, after we have accepted it, argue that it does not arise. Particularly this should be so when the petition has evoked a number of important amici.

■ Equally not before us are the findings and conclusions of the panel majority opinion, hereinafter the panel opinion. Plaintiffs frequently cite such, sometimes as their sole authority. The opinion "no longer [has] standing," except to the extent that we adopt it. *United States v. Klubock*, 832 F.2d 664, 665 (1st Cir.1987) (en banc). With one exception, we do not respond to specific assertions that we may disagree with, but disregard the opinion altogether. Correspondingly, we do not cite the dissent.

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Plaintiffs claim that Polaroid violated subsections (a) and (c) above during a period of time beginning on January 11, 1979 and continuing through February 22, 1979, in connection with the class' purchase of Polaroid securities.

Excluding subsection (b) was not some early, abandoned, view. The requests were filed on the last day of trial.

3. For example,

Did Polaroid ... know material adverse facts concerning its business prior to January 11, 1979?....

It is unlawful to omit to state a material fact. A fact is material if it is one that an investor would consider important in deciding whether or not to purchase stock.

## THE FACTS AND THE LAW: PHASE TWO

Much of the trial was devoted to matters that need not be considered. For present purposes, it appeared that Dr. Edwin H. Land, the founder and at all times president or C.E.O. of Polaroid, had added to his invention of the world-famous instant still camera another exceptional invention—an instant movie camera, Polavision. It appeared throughout the case, however, that Polavision's sales appeal did not correspond with the quality of the invention. Launched in early 1978 with great fanfare, the estimates for fall, to which production had been geared, proved to be substantially excessive. As a result, in late October, Eumig, the Austrian manufacturer, having earlier been told to increase production, was instructed to reduce by 20,000. In mid-November Eumig was told to take out another 90,000 sets, and to halt production. Plaintiffs' panel brief, quoting the fortuitous language of Eumig's cable acknowledgement, "to now finally stop production entirely," gives the impression that the halt was intended to be permanent. Conveniently, from plaintiffs' standpoint, dots in the quotation replace the subsequent sentence, "Steps have been taken to ensure a quick new start-up of production on a reduced scale." This omission aids plaintiffs in their recitation, the regrettable incorrectness of which we will come to, that "management knew that Polavision was a commercial failure." Thereafter, fourth quarter internal figures, not publicly released, confirmed that the original Polavision estimates (also not released) had been substantially excessive.

The next event was a newspaper release published on January 9, 1979, that Rowland Foundation, a charitable trust established by Dr. and Mrs. Land, was to sell 300,000 shares of Polaroid, in part for funds for a new project, and in part to diversify its portfolio. Defendant participated in the preparation of the release, but not in the action itself. It is not claimed that the release was in any way untrue. Plaintiffs' claim it misleading because additional information should then have been given the public. The sale was consummated on January 11. For some reason, never explained, plaintiffs take January 11, rather than January 9, or the date of the November report, as the day on which fraudulently affected purchases began.

On February 22, 1979, immediately following the annual meeting, defendant announced further facts about Polavision's lack of success, and the market fell, shortly, by some 20%. In a separate trial on damages, the jury found that plaintiff purchasers' recovery should be $9.75 a share. This matter is not before us. Further facts will appear in the course of the opinion.

### 1. Misrepresentation

By way of introduction we note that while securities fraud is an exception to the general rule that a party must show reliance, it being presumed that the fraud affected the market, *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *see Roeder*, 814 F.2d at 27, it must be asked what effect could there have been, on anyone, of conduct not discovered to have been misleading even by hostile examiners, until, after eight years and completion of trial, it was concluded that discovery of such was necessary for recovery.

Starting with the Third Quarter Report, that plaintiffs' brief now finds assisted misrepresentation because "Polaroid featured Polavision on the cover," plaintiffs point out that after President McCune "announced record worldwide sales and earnings for both the third quarter and the first nine months of 1978, ... Mr. McCune noted that the Company's worldwide manufacturing facilities continue to operate at close to maximum capacity," whereas, in fact, Polavision's contract supplier, Eumig, was told, shortly before the report, to hold up on 20,000 units. We note, first, that the statement, taken as a whole, was true; it expressly recognized an absence of totality.[4]

---

4. The entire paragraph read,
   Mr. McCune noted that the Company's worldwide manufacturing facilities continue to operate at close to maximum capacity. Construction of a new building in Norwood, Massachusetts, to house expanded camera manu-

Of more specific importance, it flagged, on three of its three and a half pages of text, that Polavision's effect on earnings was negative. On page one, "He noted also that earnings continue to reflect substantial expenses associated with Polavision, Polaroid's new system of instant movies." This sentence was recast on the two subsequent pages, "The ratio of cost of sales to net sales increased ... due primarily to ... and to substantial expenses associated with Polavision." With this emphasized three times, we ask did this report mislead investors to buy stock because Polavision was doing so well?

■ Plaintiffs quote *Roeder*, 814 F.2d at 26, that even a voluntary disclosure of information that a reasonable investor would consider material must be "complete and accurate." This, however, does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be "so incomplete as to mislead." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Disclosing that Polavision was being sold below cost was not misleading by reason of not saying how much below. Nor was it misleading not to report the number of sales, or that they were below expectations.

Plaintiffs do make a contention that, if correct, would trouble us. In their brief they say,

[B]y late October 1978 Polaroid knew that Polavision was a commercial failure. Polaroid had begun marketing the product to dealers below cost.... Sales

facturing facilities is on schedule. "Planning is proceeding," Mr. McCune said, "for the development of the recently acquired site for film assembly in Andover, Massachusetts, and film assembly expansion continues at Polaroid's facility in Enschede, The Netherlands." The Company has also concluded an agreement with the Government of Ireland, he stated, for the construction of a new facility near Dublin to manufacture SX–70 film and cameras as an additional element of its program to supply the indicated increase in worldwide demand.

nonetheless continued significantly under plan.

We could agree that if management knew at the time of the report that Polavision was a commercial failure, to say simply that its earnings were negative might well be found to be a material misrepresentation by half-truth and incompleteness. Plaintiffs' own recital, however, was not even a half-truth. Defendant had not "begun" selling below cost "by late October" (in spite of which sales continued to fall below estimate). Polavision's earnings had been negative, and so reported, in the Second Quarter Report to Shareholders. But, far more serious, on the uncontradicted evidence defendant did *not*, at any material time, know that Polavision was a commercial failure.[5] The most convinced of all of eventual success, and the most significant, was Dr. Land. The only difference in internal opinion was that some of defendant's officers contemplated a smaller number of sales than did others, but none thought there would be failure. On this record, we find it incomprehensible that plaintiffs could make a statement so far from the truth.

We come, next, to the January 9 Rowland Foundation sale release. There was nothing untrue or misleading in the release itself, but plaintiffs say, with support from the panel opinion, that it should have contained additional information in order to keep the November report from being misleading. We turn to this broad matter that has interested the amici.

### 2. *Duty to Update*

■ Obviously, if a disclosure is in fact misleading when made, and the speaker

5. Mr. Buckler, an executive vice president and a member of the management executive committee testified,

Q. Mr. Buckler, in 1978 and early January and February 1979 was there any intent on the part of Polaroid to abandon Polavision?
A. No, there wasn't.
Q. In 1978 and early 1979, Mr. Buckler, did you believe Polavision could be a commercially-successful venture for Polaroid?
A. Yes, I did, and I was committed to it at that time.

thereafter learns of this, there is a duty to correct it. In *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 758 (3d Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985), cited by the panel, the court called for disclosure if a prior disclosure "becomes materially misleading in light of subsequent events," a quite different duty. We may agree that, in special circumstances, a statement, correct at the time, may have a forward intent and connotation upon which parties may be expected to rely. If this is a clear meaning, and there is a change, correction, more exactly, further disclosure, may be called for. *Cf. In re Phillips*, 881 F.2d 1236 (3d Cir.1989); *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88 (2d Cir.1981). The amici are concerned that this is a principle with grave dangers of abuse. Fear that statements of historical fact might be claimed to fall within it, could inhibit disclosures altogether. And what is the limit? In the present case if the shoe were on the other foot, and defendant could have, and had, announced continued Polavision profits, for how long would it have been under a duty of disclosure if the tide turned? Plaintiffs' contention that it would be a jury question is scarcely reassuring.

We do not, however, face this question. The panel opinion was a mixed marriage of a duty to update and outright rejection of *Roeder*. After indicating reluctance to accept plaintiffs' contention that the Third Quarter Report was misleading when made, the panel opinion, in holding that it could be found misleading in light of later developments, said as follows.

> [E]ven if the optimistic Third Quarter Report was not misleading at the time of its issuance, there is sufficient evidence to support a jury's determination that the report's relatively brief mention of Polavision difficulties *became* misleading in light of the subsequent information acquired by Polaroid indicating the seriousness of Polavision's problems. This subsequent information included ... Polaroid's decision to ... stop Polavision production by its Austrian manufacturer, Eumig, *and its instruction to its Austrian supplier to keep this production*

> *cutback secret.* We feel that a reasonable jury could conclude that this subsequent information rendered the Third Quarter Report's brief mention of Polavision expenses misleading, triggering a duty to disclose on the part of Polaroid. (Emphasis in orig.)

At the time of the Rowland sale,

> while selling the stock had absolutely nothing to do with Polaroid's financial health.... some might find it less than forthcoming for the press release not to have at least mentioned Polavision's difficulties so that the investing public could assess for themselves the reasons behind the sale.

That this was an improper mix was made conspicuous by plaintiffs' oral argument.

> [W]e've cited the specific passages of Mr. McCune's testimony in our brief, where Mr. McCune testified that the expression, "continued to reflect substantial expenses" was intended to convey that that condition would continue in the future.

> .    .    .    .    .

> What we're saying is that a jury could find that this statement, even if it wasn't misleading when issued, became misleading because of the forward-looking nature.

This is a failure to recognize that what Mr. McCune said was a single, simple, statement, that substantial expenses had made Polavision's earnings negative. Though the panel opinion characterized it as "relatively brief," it was precisely correct, initially. Even if forward-looking, it remained precisely correct thereafter. Plaintiffs' claim, "The statement was plainly intended to survive the date of issuance, and therefore a jury could reasonably find a duty to update and correct exists," means nothing, unless "update" means something more than "correct." And, indeed, in arguing that the statement did not "remain true," plaintiffs' brief, unabashedly, points solely to matters outside the scope of the initial disclosure, in no way making it incorrect or misleading, originally, or later.

The shell in plaintiffs' gun at trial, and the one substituted on appeal, are all per-

cussion cap and no powder. We understand the amici apprehension because of the panel opinion's not only requiring update, but requiring it in terms of a new duty that had never been undertaken. With those errors corrected, however, we see no reason to proceed further. Plaintiffs have no case.

This decision moots plaintiffs' appeal on the subject of interest.

*The court's denial of judgment for defendant n.o.v. is reversed, with costs in this court, and the cause is remanded for dismissal of the complaint, with costs in the district court.*

BOWNES, Senior Circuit Judge, dissenting.

At the outset I think it necessary to state what this case is not about. This case is not about the extent to which our opinions do or do not "command response." Nor is it about the happy or unhappy performance of counsel, the lower court, or even the panel whose opinion has now been withdrawn by the full court. Rather, the case presents important issues concerning, *inter alia,* the scope of a corporation's disclosure duties under federal securities law as well as the province of the jury in making factual determinations in securities litigation. With respect, I not only disagree with the majority's resolution of certain of these issues, but I also believe that the issues merit more extended discussion than the majority has accorded them. I begin with an exposition of the pertinent facts.

Polaroid is a manufacturer of instant photographic and light polarizing products based in Cambridge, Massachusetts. In the spring of 1978, Polaroid began national sales of its much-heralded instant motion picture system, Polavision. Polaroid introduced Polavision with a multi-million dollar advertising campaign in March, 1978, and as of that time, projected worldwide sales of 200,000 units in 1978.

The facts that form the heart of this dispute began with the issuance of Polaroid's Third Quarter Report to Stockholders on November 5, 1978. The bulk of that report spoke in glowing terms of the suc-

cessful year Polaroid was having in 1978. Fueled by instant camera and film sales, Polaroid was posting record earnings in 1978, and its Third Quarter Report emphasized Polaroid's booming sales and record manufacturing output. One brief statement in this report, however, acknowledged that Polaroid's earnings "continue to reflect substantial expenses associated with Polavision." Two other statements observed that Polaroid's cost of sales had increased due, in part, to these same Polavision expenses.

The "substantial expenses" resulted from Polavision sales that were well below initial projections. The lower than expected sales caused Polaroid, in October, 1978, to instruct its Austrian supplier, Eumig, first to reduce its production of Polavision units, and then in November, 1978, to cease production entirely, at least until excess inventory was depleted. Polaroid also requested that Eumig keep information about the production cut secret from the public.

The effect of these low Polavision sales on earnings began to be quantified, albeit tentatively, as early as December, 1978. On December 4, 1978, an internal Polaroid reporting document entitled Forecast 11 was circulated to the Management Executive Committee. The report was based on 10 months actual sales and a forecast for November and December. In Forecast 11, the Polavision sales projection for 1978 dropped to 97,000 units, down from 100,000 projected in October and the 200,000 projected in February. Also, the preliminary earnings estimate for the fourth quarter was calculated to be $1.37 per share, lower than most market analysts were predicting.

The next internal report, Forecast 12, was circulated on January 15, 1979. Forecast 12 was based on 11 months actual sales and an estimate for December, 1978 that was calculated, in part, from early December results. Its preliminary earnings calculation estimated fourth quarter earnings to have been $1.31 per share, one cent less than the final, audited figure of $1.32 per share ultimately calculated. Forecast 12 also reflected the need to take

an additional reserve for Polavision expenses in the fourth quarter. A $6.8 million reserve was taken on February 1.

At approximately the same time as these events were occurring, the Rowland Foundation, a charitable organization run by Dr. Edwin Land, Polaroid's founder, decided to sell 300,000 shares of Polaroid stock. A draft press release announcing the sale was given to Polaroid's in-house general counsel on the morning of January 9 by Julius Silver, a Polaroid vice-president and director who also acted as attorney for the Rowland Foundation. The press release, printed on Rowland Foundation stationery, was issued by Polaroid's public relations department in the late afternoon of January 9. The release announced as one of the reasons for the sale the desire to diversify the Foundation's assets and free up funds for new pursuits. It also mentioned the impending retirement of Dr. Land as Chairman and Chief Executive Officer of Polaroid. The sale of stock took place on January 11, at a price of $52 per share, for a total of $16 million.

Approximately five weeks later, after the close of the market on February 22, 1979, Polaroid issued a press release announcing its 1978 earnings. The release reported a 26% earnings gain for all of 1978, and earnings per share of $1.32 in the fourth quarter. Concerning Polavision, the press release announced:

> The Company's 1978 record earnings were achieved notwithstanding manufacturing costs and marketing expenses substantially in excess of revenues from the Polavision program. This program is expected to continue to make significant demands on cash and earnings in 1979.[1]

The market reaction to this release was quite pronounced. Between February 22 and March 1, the price of Polaroid's common stock dropped from $49.625 to $39.875, a difference of $9.75. It then stabilized at this level.

The named plaintiffs represent two certified classes of persons who purchased (1) Polaroid common stock or (2) call options on Polaroid common stock during the period January 11, 1979 through February 22, 1979 (the "Class Period"), and who held such securities as of the close of trading on February 22, 1979. Plaintiffs allege that the market price of Polaroid securities was artificially inflated during the class period as a result of Polaroid's violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.[2] Specifically, plaintiffs claim that Polaroid knowingly or recklessly breached a duty to disclose adverse material facts concerning sales difficulties with Polavision; that Polaroid's failure to disclose these facts artificially inflated the price of Polaroid securities; and that plaintiffs, having relied on Polaroid's conduct, consequently suffered damages when the information eventually was released and resulted in a sharp decline in the price of Polaroid's securities.

At the liability phase of the bifurcated trial, Polaroid moved for a directed verdict after the close of plaintiffs' presentation. This motion was denied. The jury returned a verdict in favor of the plaintiffs and answered special interrogatories finding that Polaroid had knowingly or recklessly breached a duty to disclose material adverse facts known to it prior to January 11, 1979, and that plaintiffs had suffered a loss causally related to Polaroid's conduct. Af-

---

1. Polavision sales did not improve. Sales continued to drop and Polavision eventually was removed from the market.

2. Rule 10b–5 states:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
     (a) To employ any device, scheme, or artifice to defraud,

  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5 (1990).

ter the trial on damages, the jury found that for each day of the class period, the price of Polaroid common stock was inflated by $9.75 above its true value. The trial judge entered judgment accordingly, and denied Polaroid's motions for judgment n.o.v. or, alternatively, for a new trial.

Polaroid appealed, claiming that the trial judge had committed reversible error in his instructions to the jury on each of the legal elements of securities fraud and that there was insufficient evidence as a matter of law to support the jury's verdict. A divided panel of this court agreed with Polaroid that certain jury instructions had been flawed and vacated the judgment on that basis. The panel concluded, however, that sufficient evidence existed to support the plaintiffs' case and remanded for a new trial.

One of the crucial issues before the panel concerned the sufficiency of the evidence to support the plaintiffs' claim that Polaroid had a duty to disclose adverse information regarding Polavision's difficulties. Plaintiffs based their allegations regarding the existence of a duty .on three grounds. First, plaintiffs claimed that Polaroid's Third Quarter Report was misleading because Polaroid had buried an extremely brief mention of Polavision expenses within an otherwise glowing summary of 1978 earnings to date. Plaintiffs argued that the Report's failure to contain more concrete information regarding Polavision's difficulties was misleading, and triggered a duty to disclose adverse facts. Second, plaintiffs alleged that information compiled by Polaroid after November 5, including increasingly negative reports regarding Polavision sales as well as reasonably certain preliminary calculations of lower than expected fourth quarter earnings (Forecasts 11 and 12), constituted adverse material facts that Polaroid was under a duty to disclose to prevent its optimistic Third Quarter Report from being misleading. Finally, plaintiffs claimed that Polaroid was intricately involved with the press release announcing the Rowland Foundation's sale of stock and that it was materially misleading for Polaroid not to include in that press release some mention of the difficulties

with Polavision. Plaintiffs argued that this conduct on the part of Polaroid constituted a knowing or reckless breach of a duty to disclose material adverse facts that resulted in harm to the plaintiffs when the adverse information became known and triggered a sharp decline in the price of Polaroid securities.

Of these three possible bases advanced by the plaintiffs to support a duty to disclose, the panel expressed reservations about the sufficiency of the evidence to support theories one and three, but reserved judgment on them. The panel did rule, however, that a properly instructed jury could base a duty to disclose on theory two. Specifically, the panel stated: "even if the optimistic Third Quarter Report was not misleading at the time of its issuance, there is sufficient evidence to support a jury's determination that the report's relatively brief mention of Polavision difficulties *became* misleading in light of the subsequent information acquired by Polaroid indicating the seriousness of Polavision's problems." (Emphasis in original).

Polaroid petitioned for a rehearing before the full court. The petition was granted to consider whether the panel's ruling with respect to plaintiffs' second theory erroneously created an overly broad "duty to update" on the part of Polaroid, and, if so, whether overturning the panel on this ground required entry of judgment in favor of Polaroid. The majority of the court has answered both questions in the affirmative. I respectfully disagree.

## I. DUTY TO DISCLOSE

In *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir.1987), this court identified three situations that could trigger a duty to disclose: (1) when a "corporate insider trades on confidential information," (2) when a corporation has made "inaccurate, incomplete, or misleading prior disclosures," and (3) when a statute or regulation requires disclosure. *Id.* at 26–27; *see also Staffin v. Greenberg*, 672 F.2d 1196, 1203–04 (3d Cir.1982) (identifying insider trading and misleading statements as the two con-

texts that trigger a duty to disclose). *Roeder* stated further that:

> The materiality of the information claimed not to have been disclosed, however, is not enough to make out a sustainable claim of securities fraud. Even if information is material, there is no liability under Rule 10b–5 unless there was a duty to disclose it.

*Roeder,* 814 F.2d at 26; *see also Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5"); *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980); *Starkman v. Marathon Oil Co.,* 772 F.2d 231, 238 (6th Cir.1985) ("[T]he established view is that a 'duty to speak' must exist before the disclosure of material facts is required under Rule 10b–5."), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986).

Invoking the second factor articulated in *Roeder,* the panel opinion stated that a duty to disclose could arise if a company possessed material facts that must be released in order to render prior statements not misleading. The panel held that sufficient evidence existed in the record to support the existence of a disclosure obligation on the part of Polaroid under this theory, and accordingly remanded for a new trial.

Polaroid challenges the panel's disclosure theory as an unwise extension of *Roeder.* At the heart of this challenge is a distinction that Polaroid draws between a corporation's duty to correct prior statements, and a corporation's duty to update prior statements. Polaroid appears to concede that in two types of situations corporations may have a duty to disclose information in order to correct prior statements. First, there is a duty to correct prior statements that were inaccurate or misleading when they were made. *See, e.g., Roeder,* 814 F.2d at 26–27. Second, there can be a duty to correct prior statements of a forward-looking or predictive nature that, although perhaps true when made, have become misleading due to subsequent events.[3] *See, e.g., In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1245 (3d Cir. 1989) ("There can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised."); *Greenfield v. Heublein, Inc.,* 742 F.2d 751, 758 (3d Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985); *Ross v. A.H. Robins Co.,* 465 F.Supp. 904, 908 (S.D. N.Y.) ("It is now clear that there is a duty to correct or revise a prior statement which was accurate when made but which has become misleading due to subsequent events. This duty exists so long as prior statements remain 'alive'."), *rev'd on other grounds,* 607 F.2d 545 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). Polaroid contends, however, that corporations have no duty to update statements of past historical fact that were accurate when made but that have simply become stale with the passage of time. It argues that the panel opinion unwisely created such a duty to update and that this poses an impossible dilemma for companies in trying to determine their disclosure obligations.

Upon reconsideration, I am persuaded that certain language in the panel opinion, when construed in the factual context of this case, could be interpreted as creating an overly broad duty on the part of corporations to update even accurate statements of past historical fact. To the extent the *en banc* majority curtails this language, I concur.[4] Even with a narrower view of

---

3. Determining whether a statement is of sufficient continuing viability or possesses a sufficiently forward-looking nature to support a duty to disclose raises a host of difficult questions, which are perhaps best considered on a case-by-case basis. The facts of this case do not require me to address these questions. *See infra* n. 7. One possible example of such a statement, however, would be an announcement by a company that it had just secured a major long-term contract to provide products or services to another party. If the contract collapsed, for some reason, the company arguably would have a duty to disclose this information to prevent its prior statement, which would still be "alive," from misleading investors.

4. I do not, however, agree with the *en banc* majority's characterization of the panel opinion as constituting an "outright rejection" of *Roeder,*

corporate disclosure obligations, however, I am convinced that there is still sufficient evidence to warrant sending this case back for a new trial.

## II. MATERIALLY MISLEADING STATEMENTS

Under the disclosure standard articulated in *Roeder*, 814 F.2d at 26–27, if Polaroid uttered misleading statements in its Third Quarter Report, or if Polaroid failed to reveal in the Report information necessary to make other statements not misleading, such conduct would trigger a duty to disclose. For the reasons that follow, I believe sufficient evidence exists to require remanding this case for a properly instructed jury to determine whether the Third Quarter Report was misleading in this sense at the time of its issuance.[5]

Plaintiffs' argument with respect to the misleading nature of the Third Quarter Report rests in large part on the claim that the Report's optimistic discussion of 1978 earnings, together with its failure to contain more than but a brief mention of Polavision expenses, created a misleading impression with respect to the financial health of Polavision and of Polaroid.[6] Examina-

tion of the Report and of other evidence in the record provides some measure of support for the plaintiffs' claim.

There can be little dispute that the overall tone of the Third Quarter Report was abundantly optimistic. The Report stated that Polaroid's "worldwide manufacturing facilities continue to operate at close to maximum capacity." It also spoke of "record worldwide sales and earnings for both the third quarter and the first nine months of 1978" and referred to the construction of new plants to house expanded manufacturing facilities. Finally, the Report featured a picture of Polavision on its front cover, supporting the inference that the optimism expressed in the report extended to Polavision as well.

Yet, the record furnishes support for plaintiffs' contention that none of these statements reflected the true status of Polavision. In an October 31 telex, Eumig, Polaroid's Austrian manufacturer of Polavision units, confirmed that Polaroid had asked it to cut back Polavision production by 110,000 units. In a November 14 telex, Eumig subsequently confirmed that Polaroid had instructed it to cease Polavision production entirely. Even though this last

---

an opinion that I authored and with which I have more than a passing acquaintance. The panel may have extended *Roeder* to an extent at odds with the full court, but it in no way rejected *Roeder*. Indeed, there is language in the panel opinion expressly reaffirming *Roeder's* standard.

5. It is true that the panel opinion expressed reservations about the sufficiency of the evidence to support plaintiffs' argument regarding the misleading nature of the Third Quarter Report at the time of its issuance. Contrary to Polaroid's contentions, however, the panel did not decide the matter finally. In any event, the question is up for reconsideration along with the other duty-to-disclose issues.

6. Polaroid contends, and the majority appears to agree, that plaintiffs should be barred from raising on appeal the issue of misrepresentations or misleading conduct because they allegedly did not present this theory at trial. I disagree. The plaintiffs' theory consistently has been that Polaroid's failure to disclose information misled investors. As part of their support for this theory, plaintiffs introduced evidence pertaining to information acquired by Polaroid

prior to November 5 (e.g., the Eumig production cutback) and yet not disclosed by Polaroid in its Third Quarter Report or later. In his closing argument to the jury, plaintiffs' counsel explicitly stressed the allegedly misleading nature of the Third Quarter Report, stating:

Now, Mr. Tolan [Polaroid's counsel] suggested to you that the October announcement, the third-quarter announcement, revealed that they [Polaroid] were having Polavision losses. Did that announcement reveal that things were so bad they stopped producing it? ... [Polaroid was] bursting at the seams, and they were telling the world, we can't produce enough of our product. Did they tell the world that they shut down production of Polavision, that they laid off workers? They didn't.

Concededly, plaintiffs have emphasized the misleading nature of the Third Quarter Report more heavily on appeal than they did at trial. This increased emphasis undoubtedly is due to the plaintiffs' accurate perception that the part of their disclosure theory that rested on information acquired by Polaroid after November 5 is of questionable validity. A change in emphasis, however, does not constitute an objectionable alteration of a legal theory advanced below.

telex was not sent by Eumig until after November 5, a jury reasonably could infer that Polaroid must have been in the process of making this decision prior to November 5.

This evidence would support an inference that Polaroid had assembled sufficient information prior to the issuance of the November 5 quarterly report to know that there were significant problems in Polavision sales. Certainly, the Third Quarter Report's statement about manufacturing facilities operating at close to maximum capacity was not true as to Polavision. Nor were the statements concerning record sales or expanding manufacturing facilities accurate as to Polavision.

Despite these indications of serious difficulties in Polavision sales, the Third Quarter Report's only mention of Polavision consisted of three scattered references to the fact that earnings and cost of sales continued to reflect "substantial expenses associated with Polavision." The majority focuses on these references and holds that no reasonable jury could find the Report to be misleading because it contained this mention of Polavision expenses. I disagree. The references to Polavision expenses were brief—only one even constituted a full sentence—and were buried in a glowingly optimistic report about the tremendous year that Polaroid was having. Moreover, the mere statement that there were substantial *expenses* associated with Polavision does not convey that Polaroid was experiencing serious difficulties in Polavision *sales*. Substantial expenses are a natural part of any new product's development, even for products that achieve instant commercial success. Polavision, however, was experiencing more than simply normal start-up expenses; Polavision was suffering from significantly lower than expected *sales*. It is this information about poor sales that plaintiffs claim should have been disclosed in the Third Quarter Report.

Indirect proof of the incomplete nature of the Third Quarter Report's disclosures is provided by Polaroid's instructions to Eumig to keep news of the Polavision production cutback secret. If the Third Quarter Report's mention of Polavision expenses truly had constituted a substantially complete disclosure of Polavision's difficulties, as Polaroid and the majority seem to contend, one wonders why Polaroid would have instructed Eumig to keep the Polavision cutback secret. An obvious inference that a reasonable jury could draw is that Polaroid wanted this news kept secret because the production cutback constituted detrimental information with respect to Polavision's problems that Polaroid had not disclosed and was not yet planning to disclose—in its Third Quarter Report or otherwise.

The majority also bases its rejection of plaintiffs' claim on the fact that the Third Quarter Report was literally accurate in what it stated. Thus, with respect to plaintiffs' contention that it was misleading as to Polavision for the Report to state that "worldwide manufacturing facilities continue to operate at close to maximum capacity," the majority observes that "the statement, taken as a whole, was true; it expressly recognized an absence of totality."

Surely, however, it cannot be enough that a disclosure simply is literally accurate in what it says. Well-trained lawyers will always be able to craft literally accurate statements. Rather, the context in which a disclosure appears must be considered as crucial in any determination as to whether the disclosure is adequate or misleading. The nuances of what a disclosure emphasizes versus what it glosses over can render even a factually accurate disclosure misleading in an overall sense. *See, e.g., Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 201–03 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988); *Greenapple v. Detroit Edison Co.,* 618 F.2d 198, 205, 210 (2d Cir.1980). Phrased another way, disclosures not only must be literally accurate but they also must be "complete enough so as not to be misleading." *Staffin v. Greenberg,* 672 F.2d at 1204; *cf. Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 164 (2d Cir.1980) (acknowledging that even if there were no statement of an untrue fact, a company's issuance of rosy, optimistic statements

could be deemed misleading if internal company reports were less optimistic).

For many of the same reasons as previously articulated, I believe that sufficient evidence exists to support a reasonable jury's conclusion that Polaroid's Third Quarter Report failed to be complete enough so as not to be misleading. Although the Report clearly was drafted carefully so as to be literally accurate in what it stated, the Report failed to disclose certain concrete information regarding Polavision's difficulties. In particular, the Report contained no mention of either the lower than expected Polavision sales or the cutback in Polavision production at Eumig.

I fully acknowledge that these alleged nondisclosures are not so egregious as to constitute an overwhelming case against Polaroid.[7] Indeed, the majority persuasively has countered many of the plaintiffs' contentions. Regardless of whether I agree with the majority on the underlying merits, however, that is not the issue before us. The applicable standard does not require that plaintiffs have a substantial likelihood of success in order to get their case to the jury. Rather, our role is strictly limited to determining whether there is sufficient evidence so that a properly instructed jury could reasonably find for the plaintiffs. *See, e.g., Fact Concerts, Inc. v. City of Newport,* 626 F.2d 1060, 1064 (1st Cir.1980), *vacated on other grounds,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 50.07[2] (1990).

I believe that the plaintiffs in this case have met this threshold. I concede that it is a close question, and I recognize why corporations may be uneasy about juries' handling such close questions, particularly in complex securities litigation, where there is the potential for bias against corporate defendants. There is more than a hint of

this concern in the majority's opinion. Courts, however, must vigilantly guard against any tendency to heighten the standard required for plaintiffs to get such cases before a jury, or they risk undercutting the vital role of the jury in our legal system.

I have faith that a properly instructed jury could handle the issues presented by this case objectively and competently. I also believe that the evidence is not so weak as to support the majority's conclusion that no reasonable jury could find for the plaintiffs. Accordingly, I respectfully dissent.

---

7. In an effort to build a stronger case, plaintiffs argue that the Third Quarter Report contained forward-looking statements sufficient to trigger a duty on the part of Polaroid to disclose adverse information acquired after November 5. Although a quarterly report could, in principle, contain such forward-looking statements, I have found none in the Third Quarter Report. The Report concentrated on the presentation of in-

formation concerning Polaroid's financial results as of November 5. Nor am I persuaded by the plaintiffs' argument that Polaroid's participation in the issuance of the Rowland Foundation's press release was sufficient to trigger a duty to disclose. Rowland's stated reasons for selling its Polaroid stock had absolutely nothing to do with Polaroid's financial health.