**Joseph A. TAPOGNA and William E. Pommerening, Plaintiffs,**

v.

**Richard J. EGAN, Michael C. Reuttgers, Roger M. Marino and EMC Corporation, Defendants.**

**Civ. A. No. 91–11873–S.**

United States District Court, D. Massachusetts.

March 17, 1992.

---

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, Mass., for plaintiffs.

Edmund C. Kenealy, Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., Richard M. Meyer, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, Paul T. Dacier, EMC Corp., Hopkinton, Mass., for defendants.

MEMORANDUM AND ORDER ON PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORTS AND RECOMMENDATIONS ON MOTION TO DISMISS THE FIRST AMENDED COMPLAINT AND ON ROGER M. MARINO'S MOTION TO STRIKE AND FOR COSTS AND EXPENSES, INCLUDING ATTORNEYS' FEES .

SKINNER, District Judge.

This case arises in the wake of a general downward trend in the value of computer industry stock. Plaintiffs, as members of a class of purchasers of shares of EMC Corporation stock, allege that the company, through its officers, made a number of false and misleading statements and omissions in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5, promulgated thereunder. The defendants responded to the initial complaint by moving to dismiss, based in part on plaintiffs' failure to allege fraud with particularity in accordance with Fed. R.Civ.P. 9(b). In addition, defendant Roger M. Marino, a former officer and director of EMC, filed a separate motion to strike ref-

erences to him from the complaint as immaterial and for sanctions under Fed.R.Civ.P. 11. Marino asserts that plaintiffs conducted no reasonable inquiry before filing suit, and that no reasonable basis exists for naming him as a party defendant. In lieu of opposing the defendants' motions, the plaintiffs filed an amended complaint. All defendants responded by moving to dismiss the amended complaint, again charging plaintiffs with failure to comply with Rule 9(b). Marino, again named as a defendant, renewed his prior motion to strike and for sanctions.

The motions were referred to Magistrate Judge Collings, who issued a report and recommendation on each motion. The recommendations were to allow the defendants' motions to dismiss and to impose Rule 11 sanctions for the plaintiffs' role in improperly naming Marino as a defendant. Plaintiffs now object to the reports and recommendations of the magistrate judge.

*Background*

I determine the merits of this dispositive motion *de novo* on review of the contested report and recommendation of the magistrate. Fed.R.Civ.P. 72(b). For purposes of a motion to dismiss, I take the material allegations of the complaint as true. *Lessler v. Little*, 857 F.2d 866, 867 (1st Cir. 1988), *cert. denied*, 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989). Defendant EMC Corporation is a Massachusetts computer-related company whose stock is traded on the New York Stock Exchange. The company had been a self-proclaimed success story in the industry and had issued several optimistic statements concerning its prospects for future sales. From the fall of 1990 until the late spring of 1991, the stock rose in value from about $7 per share to its all-time high of $13 per share. Then, on Thursday and Friday, July 11 and 12, 1991, following the company's Thursday morning announcement that second quarter 1991 income would be lower than previously expected, the price of the stock sharply fell from $11 to less than $7. The following Monday, plaintiffs filed this suit.

The complaint alleges that the reports of EMC's financial condition and future sales prospects were overly optimistic and that the defendants knew of the false nature of the statements and omissions at the time they caused the statements and omissions to be made in order to artificially inflate the price of the stock and defraud the plaintiffs, who purchased EMC stock while it was rising in value. With one exception, the allegations are cast in sweeping generalizations, such as "EMC was actually experiencing a deterioration in its markets." The exception is the plaintiff's allegation that during the six-month period of rising stock price, defendants Egan and Marino were selling large blocks of stock which they had personally owned.

*Discussion*

■ Rule 9(b) requires a plaintiff to specify the time, place, and content of an alleged false representation in his complaint. *Wayne Invest., Inc. v. Gulf Oil Corp.*, 739 F.2d 11, 13 (1st Cir.1984). The complaint must also contain some factual support for the allegations of fraud. *New England Data Services, Inc., v. Becher*, 829 F.2d 286, 288 (1st Cir.1987). In *Romani v. Shearson Lehman Hutton*, 929 F.2d 875 (1st Cir.1991), the first circuit affirmed a trial court's dismissal of a complaint for failure to plead securities fraud with particularity because the complaint contained "no factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the [alleged misrepresentation] and were known and deliberately or recklessly disregarded by defendants." *Id.* at 878. The *Romani* court described the first circuit's adherence to the Rule 9(b) particularity requirement as "especially rigorous" when applied in the securities context as a guard against strike suits. *Id.*

■ The complaint adequately identifies the time, place, and content of the alleged false representations and omissions of the defendants. However, there is a void where there should be allegations of specific facts tending to show that the defendants knew that the optimistic projections were false when made. Like those in the *Romani* complaint, the generalizations alleged in the instant complaint are not suffi-

ciently particular to satisfy Rule 9(b). Rather, they are conclusions apparently based on only one set of facts, i.e., the personal stock sales. The defendants' sale of stock is the most damaging of plaintiffs' allegations, and might, in combination with other circumstances, support an inference of fraud. In this case the sales began well before the deterioration of EMC's prospects. Standing alone, the fact that the sales occurred does not support an inference of fraud. *See Pinkowitz v. Data General Corp.*, No. 90–11854–Z, 1991 WL 288829, 1991 U.S. Dist. LEXIS 19228 (D.Mass. Dec. 27, 1991).

*Rule 11 Sanctions*

■ The magistrate judge correctly noted that the plaintiffs did not respond to Marino's motion for sanctions by way of formal written opposition. The plaintiffs did argue against Marino's dismissal in a footnote to its opposition to the defendant's motion to dismiss, and the plaintiffs also orally argued against some portions of Marino's motion to the magistrate judge. I will treat the motion as if it were properly opposed.

The plaintiffs' basis for joining Marino is apparently that his ownership of over 10% of outstanding EMC stock gives rise to his status as a "controlling person" under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally ... unless the controlling person acted in good faith ...

*Id.* Marino's contention that he no longer was an officer or a director of the corporation at the time he sold his stock is not relevant to the issue of whether he was a controlling person under the Act. Marino has not made a showing that the plaintiffs' "controlling person" theory of recovery is so flawed as to trigger the imposition of sanctions, and in the absence of such a showing I will decline to do so.

*Supplemental Claims*

Under the supplemental jurisdiction statute, which codified the doctrines of pendent and ancillary jurisdiction, a district court may decline to hear state law claims once the federal claims have been dismissed. 28 U.S.C. § 1367(c)(3). *See also United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The federal claims having been dismissed in this case, the state law claims will be dismissed as well.

*Leave to Amend*

■ Plaintiffs request leave to amend their complaint, should the complaint fail to comply with the requirements of Rule 9(b). Plaintiffs have had ample opportunity to allege any facts of which they are aware from which liability may flow. Indeed, their First Amended Complaint itself was a response to an earlier charge that the original complaint failed to comply with Rule 9(b). The complaint fails because the plaintiffs apparently wish to embark on a fishing expedition at the defendants' expense, not because the plaintiffs have been imprecise in their choice of words. The complaint will be dismissed with prejudice. *See Romani*, 929 F.2d at 880–81.

Accordingly, the plaintiffs' objection to the magistrate judge's report and recommendation to dismiss is overruled and the plaintiffs' objection to the magistrate judge's report and recommendation to impose sanctions is sustained. The complaint is dismissed with prejudice. No Rule 11 sanctions will be imposed.

### REPORT AND RECOMMENDATION ON MOTION TO DISMISS THE FIRST AMENDED COMPLAINT (# 18)

COLLINGS, United States Magistrate Judge.

### INTRODUCTION

The instant securities action was instituted on July 15, 1991. In lieu of answering the original complaint, the four named defendants, Richard J. Egan, Michael C. Ruettgers, Roger M. Marino and EMC Corporation filed a motion to dismiss. On the same date that the opposition to the motion to dismiss was filed, plaintiffs Joseph A. Tapogna and William E. Pommerening,

amended their complaint as of right. This change in the pleadings prompted the defendants to file a motion to dismiss the first amended complaint in response to which an opposition was duly filed.

All four defendants are named in each of the three counts of the first amended complaint. Count I is a claim for violation of the federal securities laws, specifically section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Counts II and III are claims under Massachusetts common law, i.e., fraud and negligent misrepresentation respectively. The grounds for the motion to dismiss are failure to plead fraud with particularity as required by Rule 9(b), Fed.R.Civ.P., and failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R.Civ.P.

The defendants' dispositive motion has been referred to the undersigned for the issuance of findings and recommendations as to disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have briefed the issues raised in various memoranda of law, and oral argument was heard in the latter part of December. With the record now complete, the motion to dismiss the first amended complaint is ripe for decision.

## THE FACTS

The factual background of this case as recited is gleaned from the material allegations of the first amended complaint which are accepted as true. *Lessler v. Little*, 857 F.2d 866, 867 (1 Cir., 1988), *cert. denied*, 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989); *Williams v. City of Boston*, 784 F.2d 430, 433 (1 Cir., 1986). On April 19, 1991, plaintiff Joseph A. Tapogna ("Tapogna") purchased 1,000 shares of the common stock of EMC Corporation ("EMC"). (First Amended Complaint # 13, para. 5a) On the same date, William E. Pommerening ("Pommerening") bought 750 shares of the common stock of EMC jointly with his wife. (# 13, para. 5b) Tapogna and Pommerening purport to bring this suit as a class action, seeking to represent all those who purchased the common stock of EMC dur-

ing the period from September 24, 1990 through July 11, 1991. (# 13, para. 13)

EMC is a Massachusetts corporation with a principal place of business in the Commonwealth. (# 13, para. 6) EMC is engaged in the design, manufacture and marketing of high performance storage products and related services for certain midrange and mainframe computer systems. (*Id.*) Defendant Richard J. Egan ("Egan"), co-founder of EMC, has served as a director and the Chief Executive Officer of the company as well as, since January 1988, holding the position of Chairman. (# 13, para. 7) It is alleged that Egan owned over ten percent of the stock of EMC during the time period relevant to the amended complaint. (# 13, para. 8)

Defendant Roger M. Marino ("Marino") was also a co-founder of EMC. (# 13, para. 8) Although Marino served as Treasurer, Vice–Chairman and a director of the company, he resigned from the first two positions in July of 1990, and then as a director in January, 1991. (*Id.*) Like Egan, Marino is alleged to have owned over ten percent of EMC's stock during the pertinent time period. (*Id.*) The third individually name defendant, Michael C. Ruettgers ("Ruettgers") is the President and Chief Operating Officer of EMC. (# 13, para. 9)

The gist of the first amended complaint is that the defendants conspired to issue and disseminate materially false and misleading representations and public statements so as artificially to inflate and maintain the market price of EMC's common stock to the detriment of stock purchasers. (# 13, para. 10, 20) Tapogna and Pommerening contend that the representations and statements, which shall be detailed hereinafter, were materially false and misleading and/or recklessly made due to the existence of material, undisclosed, adverse facts about EMC and its operations. (# 13, para. 20)

The positive and optimistic statements made to the investing public about which the plaintiffs complain are as follows. On or about September 24 and 25, 1990, it was reported in publications such as *Reuters, Business Wire,* and *The Boston Globe* that

EMC would soon be introducing its next generation data storage technology called Symmetrix. (# 13, para. 22) According to Reuttgers, sales from Symmetrix were expected to add significantly to fourth quarter revenues in 1990, up to as much as $100 million, and that 1991 revenues could be between $200 and $300 million. (*Id.*) The Company forecast that Symmetrix sales would increase "dramatically" in 1992 as the product line expanded and the technology became more familiar. (*Id.*)

EMC announced its third quarter 1990 earnings on or about October 22, 1990. (# 13, para. 23) Revenues reflected a 23 percent increase over those reported for the third quarter 1989 with a net income increase equal to 10 cents a share as against a loss for the same quarter the prior year. (*Id.*) For the nine month period ending September 30, 1990, revenues were reported in excess of $124 million with a net income equalling 22 cents per share as compared to revenues of $92 million and a loss of more than $11 million for the corresponding 1989 nine month period. (*Id.*) In a *Business Wire* article reporting EMC's third quarter figures, Egan was quoted as being "very pleased with the results in the third quarter and for the year to date. This is especially true since we seem to be swimming against the prevailing economic tide." (# 13, para. 24)

On November 13, 1990, EMC announced the introduction of an additional model to its Symmetrix series. (# 13, para. 25) Egan stated that "Symmetrix will have a major impact not only on the computer industry but also on the business community" by enabling companies "to get vital information more quickly, while extending computer life and containing computer costs." (*Id.*) According to Egan, EMC was able to introduce its version of Redundant Arrays Of Inexpensive Disks (RAID) first because EMC, "the leading independent computer storage manufacturer," was exclusively devoted to computer storage and was an established technology producer with "the technical expertise, resources and commitment necessary to marry these two technologies and to do so in less time than our competitors." (*Id.*) The price of

EMC's common stock rose in response to this announcement. (# 13, para. 26)

EMC issued a press release on December 21, 1990 reporting the "rapid acceptance" and success of a disk drive for IBM computers produced by EMC. (# 13, para. 28) In addition, the Company stated that several new products were planned for 1991 that were expected to maintain or improve EMC's market position among third party suppliers of drives. (*Id.*)

On January 28, 1991, EMC announced that it expected the financial figures for the fiscal year ending December 29, 1990, to reflect substantial improvements over the prior year. (# 13, para. 29) According to Ruettgers, the increases were purportedly "a result of many factors including improvements in product quality and production efficiencies and continued strong market demand for our products." (*Id.*)

On February 12, 1991, EMC announced that orders of Symmetrix were backlogged well into the first quarter of 1991 and, consequent to the high demand and performance of the product since its introduction, that prices would be increased. (# 13, para. 30)

On February 19, 1991, record revenues for 1990, up 29 percent over 1989, were announced by EMC. (# 13, para. 31) The Company declared that it anticipated its product sales to continue to grow throughout 1991, and that several new products and services were expected to be introduced. (*Id.*) The 1990 annual company report released March 29, 1991, included a letter from Egan and Ruettgers which described their goal for EMC: "to become the storage supplier of choice for the vast majority of users who, today, buy these products only from the computer manufacturer." (# 13, para. 32)

It was reported by *Business Wire* in early April, 1991, that EMC was enlarging its IBM mid-range product line to include new disk and tape products together with remote maintenance service. (# 13, para. 33) These innovative technologies and services were reported to outperform competitors and be advantageous to mid-range

users not only in terms of cost, but also in data storage and security, better service, less downtime and reduced overhead. (*Id.*) Two days subsequent to this announcement, the price of EMC's stock rose to $12 per share. (*Id.*)

As reported on April 18, 1991, EMC's first quarter 1991 revenues increased 27 percent over the same period in 1990 while net income increased by 240 percent. (# 13, para. 34) Defendant Egan was quoted as stating:

> We feel that we are sending a clear signal that EMC is on solid ground and that the company will continue to expand its position in the market as the leading independent supplier of technologically advanced storage products for IBM mainframe and mid-range computer users.

(*Id.*)

The tenor of the annual meeting held on May 8, 1991 was similarly upbeat as EMC's dramatic return to profitability and financial stability was detailed. (# 13, para. 38)

During this period, the price of EMC stock continued to rise, ultimately reaching a high of $13 per share on May 9, 1991. (# 13, para. 35, 38) Over the same period, from October 22, 1990 through May 9, 1991, Egan and Marino are each alleged to have sold hundreds of thousands of shares of EMC stock that they owned. (# 13, para. 36, 37)

The positive reports from EMC continued in May, 1991, when a co-marketing agreement with Sun Data, Inc. was announced. (# 13, para. 39) It was projected that this deal would generate an additional $8–$10 million in revenue for EMC. (*Id.*) On June 18, 1991, the Company announced the introduction of the Champion Tape Subsystem, the first 20 gigabyte. (# 13, para. 40) Nine days later, *Dow Jones* reported that EMC had received an order from Control Data Corp. for twenty Symmetrix data storage systems. (# 13, para. 41)

On July 11, 1991, it was announced that EMC expected lower than anticipated income for the second quarter of 1991. (# 13, para. 42) Competitive pricing pressures combined with increases in expense levels were cited as the cause for the forecasted decline. (*Id.*) At the time of the announcement, defendant Egan stated:

> Although profitability this past Quarter will be less than Plan, we remain optimistic because demand for our non-OEM Mid-range and Mainframe storage products continues to show strong steady growth and as volumes increase, we should achieve better economies of scale. In addition, there will be strong attention paid to costs and expenses for the remaining half of 1991.

*Id.*

In response to this news, analysts cut their projections for EMC stock from approximately 20 cents per share to 10 cents per share. (*Id.*) By July 12, 1991, the market price for EMC stock fell from over $11.00 per share to less than $7.00 per share. (*Id.*)

### THE LAW

By its terms, Federal Rule of Civil Procedure 9(b) mandates that "[i]n averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of the mind of a person may be averred generally." In this Circuit, Rule 9(b) has been strictly applied to securities fraud claims. *See, e.g., Royal Business Group, Inc. v. Realist, Inc.,* 933 F.2d 1056, 1065–1066 (1 Cir., 1991); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1 Cir., 1991); *New England Data Services, Inc. v. Becher,* 829 F.2d 286, 288 (1 Cir., 1987); *Driscoll v. Landmark Bank For Savings,* 758 F.Supp. 48, 51 (D.Mass., 1991). While summarizing precedent on this issue, the First Circuit recently reiterated:

> It is well settled that Rule 9(b) requires the plaintiff in a securities fraud case to specify the time, place and content of an alleged false representation ... The requirement that supporting facts be pleaded applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party.

*Romani v. Shearson Lehman Hutton, supra,* 929 F.2d at 878. (citations omitted)

A primary purpose behind demanding such detail in the securities fraud context is "to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit.'" *New England Data Services, Inc. v. Becher, supra,* 829 F.2d at 289; *Romani v. Shearson Lehman Hutton, supra,* 929 F.2d at 878; *Konstantinakos v. Federal Deposit Insurance Corporation,* 719 F.Supp. 35, 38 (D.Mass., 1989)

To meet the Rule 9(b) specificity requirements in a case such as this where the allegations are made upon information and belief, it is imperative that **both** "the source of the information and the reasons for the belief" be laid out in the amended complaint. *Romani v. Shearson Lehman Hutton, supra,* 929 F.2d at 878 (citing cases) (emphasis supplied); *Driscoll v. Landmark Bank For Savings, supra,* 758 F.Supp. at 51; *Akerman v. Bankworcester Corporation,* 751 F.Supp. 11, 12 (D.Mass., 1990). The First Circuit has "been especially rigorous in demanding such factual support in the securities context." *Romani v. Shearson Lehman Hutton, supra,* 929 F.2d at 878. In short, to pass muster, not only must the time, place and content specifics be alleged, the complaint must also contain

> ... factual allegations that would support a reasonable inference that adverse circumstances existed at the time (the statement or representation was made), and were known and deliberately or recklessly disregarded by defendants.

*Romani v. Shearson Lehman Hutton, supra,* 929 F.2d at 878; *See also, Chanel Vachon v. Baybanks, Inc.,* 780 F.Supp. 79, 84 (D.Mass.1991); *In Re Healthco International, Inc.,* 777 F.Supp. 109, 113 (D.Mass. 1991); *Driscoll v. Landmark Bank For Savings, supra,* 758 F.Supp. at 52.

The plaintiffs have quoted and paraphrased from a compilation of SEC filings, newspaper articles, analyst reports and press releases in drafting the eighteen paragraphs of the amended complaint incorporating the allegedly false and misleading statements. From all appearances, several of the affirmative announcements about which the plaintiffs complain are accurate historical facts, i.e., quarterly revenue reports. Statements, opinions and projections attributable to particular individual defendants, although uniformly positive and upbeat, are generalized. Reports from the media and stock analysts add to the patina of EMC's success. But such a catalogue, no matter how exhaustive, coupled with the bare allegation that the representations were false and misleading, quite simply is not enough. *See, e.g., Driscoll v. Landmark Bank For Savings, supra,* 758 F.Supp. at 52–53; *Akerman v. Bankworcester Corporation, supra,* 751 F.Supp. at 13. *Loan v. Federal Deposit Insurance Corporation,* 717 F.Supp. 964, 967 (D.Mass.1989).

There is no question, nor do the defendants dispute, that the time, place and content prerequisites of Rule 9(b) are met. In addition, the plaintiffs set forth six categories of "adverse information" the defendants are alleged to have concealed or failed to disclose but which information was necessary to make their statements not misleading. (# 13, para. 43 a–f) However, in marked contrast to the prior detail, at this juncture of the pleading a broad brush approach is adopted. For example, it is alleged that

> EMC was actually experiencing a deterioration in its markets as a result of weakening economic conditions which would adversely affect the Company's growth rate in sales and revenues and which would cause operating income to decline.

Amended Complaint # 13, para. 43(a).

What is the source of this information? What is the reason for believing that it is true? What is the factual basis for stating that if true, the defendants both knew of this information and knew it to be true at the time they made the statements? There are simply no facts alleged to substantiate the conclusion either that EMC was experiencing a deterioration in its markets or the reasons for the belief, and that the defendants knew and deliberately disregarded that adverse circumstance at the time any contrary or misleading representations were made.

The remaining categories of adverse information identified, with one exception discussed below, are of the same ilk and suffer from the same deficiency. At no place in the amended complaint do the plaintiffs allege concrete, quantifiable information which the defendants knew but disregarded in making optimistic public statements such as would render those statements either false or misleading. There are no facts pleaded to support an inference that the defendants had no reasonable basis for making the predictions at the time they were made. In short, not only is the alleged adverse information too conclusory and amorphous, it is by no means related, directly or by inference, to the state of the defendants' knowledge at the relevant time.

In paragraph 43(e), plaintiffs do state specific facts which the defendants are alleged to have known. Plaintiffs allege that "[c]ontrary to having a competitive edge over IBM and other competitors, EMC was, as alleged in the complaint in *International Business Machines Corp. and IBM Credit Corp. v. EMC Corp.*, filed in this Court (91–10336N), improperly removing and utilizing components from IBM equipment to manufacture and market its own products." However, there are three problems. First, there is no allegation as to the time period when EMC was allegedly doing this. Second, and more important for present purposes, there is nothing to indicate what statement by EMC this "adverse information" proves false and misleading. There is in the first amended complaint an allegation dealing with IBM to the effect that EMC's Symmetrix product was more technologically advanced than IBM's product (# 13, para. 25). However, there is no allegation that the IBM parts which EMC allegedly put into its products were put into the Symmetrix product, and defendants deny that the suit with IBM referenced in paragraph 43(e) has anything to do with EMC's Symmetrix products.

In paragraph 28 of the first amended complaint, IBM is mentioned in the context of the statement by EMC that it had developed a disk drive which could be used in IBM computers; there is no allegation that there were any IBM components in EMC's disk drives. Similar references in statements by EMC set forth in paragraph 29 that EMC had "successfully beaten its competition (including IBM) to market with RAID technology products by well over a year" and in the development Unisys technologies bear no apparent relation to the use of IBM products in EMC systems. Rather, defendants contend that the subject of the suit involves "components of IBM 3090 main frame computers." Lastly, no relationship is shown between the alleged use of IBM products as set forth in paragraph 43(e) and the April statements set forth in paragraphs 32 and 33 of the first amended complaint that EMC

> ... anticipated sales of its products in both the IBM mid-range and mainframe markets to continue to grow throughout 1991 and that it planned to introduce several new products and services in both the IBM as well as Unisys markets.

First Amended Complaint, # 13, para. 32.

Plaintiffs must set forth facts that "indicate [the] falsity of the facts that defendant[s] did disclose." *Capri Optics Profit Sharing v. Digital Equipment Corp.*, 950 F.2d 5 (1 Cir., 1991). Put another way, plaintiffs must show a link between what was disclosed and what was not disclosed; they have failed to do so.

Third, to the extent that material from the other complaint is incorporated by reference, the pleading is improper. The papers in the other suit were filed before the instant case, and, so far as appears, are public documents which plaintiffs can readily examine. There is no excuse for setting forth conclusory factual matter from an unrelated suit ("EMC was ... improperly removing and utilizing components from IBM equipment to manufacture and market its own products.") without (a) relating the factual matter to a particular statement by the defendants, (b) demonstrating how the factual matter renders the particular statement false or misleading and (c) alleging facts which would demonstrate that the defendants were in possession of this factual matter at the time they made the statement.

In conclusion, the federal claim contained in the first amended complaint should be dismissed for failure to comply with Rule 9(b), Fed.R.Civ.P. If the state claims are brought pursuant to the pendent jurisdiction of the Court, the Court should decline to hear them and they should be dismissed. If they are brought pursuant to the supplemental jurisdiction of the Court as set forth in 28 U.S.C. § 1367, they should be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

### THE QUESTION OF GRANTING LEAVE TO AMEND FURTHER

The question arises as to whether leave to amend should be granted; I am of the opinion that it should not. The plaintiffs' original complaint was challenged on August 14, 1991 with a motion to dismiss and a lengthy memorandum pointing out with specificity the failure to comply with Rule 9(b), Fed.R.Civ.P., and citing with particular emphasis the decision in the *Romani* case. *See* # # 6 and 7. It is a compelling inference that in drafting their First Amended Complaint (# 13) which was filed on September 17, 1991, the plaintiffs took their best shot at drafting a pleading which complied with the rule. There is no indication that they have any further factual matter which they could plead that would satisfy the requirements of the rule.

Respecting the case of *International Business Machines Corp. and IBM Credit Corp. v. EMC Corp.*, referenced in paragraph 43(e) of the first amended complaint, if there was any factual information revealed by that case which supported the contention that any of EMC's statements of which the plaintiffs complain were false and misleading, it is a sure bet that such factual information would have been set out in the first amended complaint in florid detail. Granting leave to amend would be futile.

The bottom line is that not only was plaintiffs' first amended complaint "dead on arrival," there is no reasonable basis for inferring that any future complaints would "arrive" in any more viable condition.

*Backman v. Polaroid Corporation*, 910 F.2d 10, 13 (1 Cir., 1990).

In addition to the non-compliance with Rule 9(b), defendants assert that the first amended complaint should be dismissed because it alleges no facts upon which it could be found that EMC had a duty to disclose, a requirement set forth in the *Backman* case. I have not dealt with this issue because I am of the opinion that it is, in essence, a variant of the Rule 9(b) problem. In the *Backman* case, the Court reiterated its holding in *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26–27 (1 Cir.,1987) to the effect that a duty to disclose only arises in the situation in which (a) a corporate insider trades on confidential information, (b) a statute or regulation requires disclosure, and (3) a corporation has made an inaccurate, incomplete or misleading prior statement. As the *Backman* case points out, however, this requirement

> ... does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be "so incomplete as to mislead."

*Backman v. Polaroid Corp., supra,* 910 F.2d at 16 quoting from *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 862 (2d Cir. 1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

In the case at hand, the facts which would form the basis of the assertion that any of EMC's statements were "inaccurate, incomplete or misleading" triggering a duty to disclose would be the very facts which are required to be pleaded in order to comply with Rule 9(b), Fed.R.Civ.P. Similarly, any "confidential insider information" would most likely be the same type of information, i.e., facts known at the time which were not disclosed but should have been so as to prevent the statements which were released from being "so incomplete as to mislead." *See generally Capri Optics Profit Sharing v. Digital Equipment Corp., supra.*

In sum, adherence to the requirements of Rule 9(b), Fed.R.Civ.P., as interpreted by

this Circuit, will, in most cases, provide the basis for judging whether a complaint passes muster under *Backman* or is, on the other hand, "dead on arrival."

## RECOMMENDATIONS

I RECOMMEND that Count I of the first amended complaint, the federal securities claim, be DISMISSED for failure to comply with the requirements of the Rule 9(b), Fed.R.Civ.P. The two remaining claims in the first amended complaint, i.e., Counts II and III, arise under state common law. If the claims are brought pursuant to the Court's pendent jurisdiction, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), I RECOMMEND that the Court decline to hear them and that they be DISMISSED. If they are brought pursuant to the supplemental jurisdiction of the Court as set forth in 28 U.S.C. § 1367, I RECOMMEND that they be DISMISSED pursuant to 28 U.S.C. § 1367(c)(3). I FURTHER RECOMMEND that judgment be entered FORTHWITH dismissing the amended complaint and that the plaintiffs not be granted leave to file a second amended complaint.

## REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this report and these recommendations must file a written objection thereto with the Clerk of this Clerk within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1 Cir., 1980); *United States v. Vega*, 678 F.2d 376, 378–379 (1 Cir., 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983). *See also Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

January 31, 1992.

REPORT AND RECOMMENDATION ON ROGER M. MARINO'S MOTION TO STRIKE AND FOR COSTS AND EXPENSES, INCLUDING ATTORNEYS' FEES (# 20)

COLLINGS, United States Magistrate Judge.

Defendant Marino filed a motion to strike and request for costs and attorneys' fees in response to the original complaint. *See* # 8. Plaintiffs filed a brief opposition stating that the motion was moot because of the filing of the first amended complaint. (# 11). The instant motion (# 20) to strike and for costs and expenses, including attorneys' fees, was filed on October 1, 1991 in response to the allegations of the first amended complaint. No opposition or response has been filed by the plaintiffs.

Accordingly, I RECOMMEND that if the Court adopts the Report and Recommendation to the effect that this case be dismissed for failure to comply with Rule 9(b), Fed.R.Civ.P., that the motion (# 20), to the extent that it seeks to strike matter from the first amended complaint, be DENIED as moot and that the motion (# 20), to the extent that it seeks an award of costs and expenses, including attorney's fees, for violations of Rule 11, Fed.R.Civ.P., be ALLOWED. The defendant Marino is granted leave to file and serve affidavit(s) detailing the costs and expenses, including attorney's fees, claimed; the plaintiffs may file an opposition/response to the amount of the claim within fourteen (14) days (including Saturdays, Sundays and holidays) after the filing of defendant Marino's affidavit or affidavits.

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Clerk within 10 days of the party's

receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1 Cir., 1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983). *See also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

January 31, 1992.