## In re BIOGEN SECURITIES LITIGATION.

### No. Civ. A. 94–12177–PBS.

United States District Court, D. Massachusetts.

Sept. 4, 1997.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, David Bershad, Richard H. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, for Seymour Lazar.

Glen DeValerio, Norman Berman, Berman, DeValerio & Pease, Boston, MA, Robert N. Kaplan, Frederic S. Fox, Kaplan & Kilsheimer, Brian Murray, Rabin & Garland, I. Stephen Rabin, Rabin & Peckel, L.L.P., New York City, for World Futures Trading Company.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, Stanley R. Wolfe, Carole A. Broderick, Todd S. Collins, Berger & Montague, Philadelphia, PA, Klari Neuwelt, Law Offices of Klari Neuwelt, New York City, for Farrell Jones.

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, MA, Marian P. Rosner, Wolf, Popper, Ross, Wolf & Jones, New York City, for David L. Hoexter.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, for Seymour Lazar.

David Pastor, Kenneth G. Gilman, Gilman & Pastor, Boston, MA, Zachary Alan Starr, Law Office of Zachary Alan Starr, New York City, Merrill Goldfarb, Law Offices of Katz & Goldfarb, Boston, MA, for Loretta C. Hartless.

Glen DeValerio, Norman Berman, Berman, DeValerio & Pease, Boston, MA, Mel Lifshitz, Bernstein, Liebhard & Lifshitz, New York City, for Dov Knoll.

Patrick J. Sharkey, Thomas R. Murtagh, John Sylvia, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for James L. Vincent, Biogen, Inc., James Mullen, James R. Tobin.

Lisa C. Wood, Nutter, McClennen & Fish, Boston, MA, for Kenneth Murray.

Allison W. Allen, Nutter, McClennen & Fish, Patrick J. Sharkey, Thomas R. Murtagh, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Alexander Bearn.

Michael G. Lange, Berman, DeValerio & Pease, Boston, MA, for Sheila Gralish.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This case involves a class action alleging securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), 78t(a), and Rule 10(b)–5, promulgated thereunder.[1] The de-

1. Section 10(b) of the 1934 Act, codified at 15 U.S.C. § 78j(b), makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe ... for the protection of investors." Rule 10(b)–5, codified at 17 C.F.R. § 240.10b–5, implements Section

fendants are Biogen, Inc., a biopharmaceutical company and its Chairman and Chief Executive Officer, James L. Vincent. Plaintiffs seek a class of all persons who purchased the common stock of Biogen during the period from January 11, 1994 through and including October 31, 1994, excluding the defendants and certain affiliated parties.

The case is before this Court on both the defendants' Motion for Summary Judgment (Docket No. 127) and the plaintiffs' Motion for Class Certification (Docket No. 125).

After hearing, the Court *ALLOWS* in part and *DENIES* in part the defendants' summary judgment motion. The Court also *ALLOWS* in part and *DENIES* in part the plaintiffs, motion to certify a class.

## I. *BACKGROUND*

Drawing all inferences in favor of the non-moving party, the Court treats the following undisputed material facts as true for purposes of ruling on the motions for class certification and summary judgment.

### A. *Hirulog*

Throughout the early 1990s, one of Biogen's leading new drug candidates was Hirulog, a blood thinner or anti-clotting agent, which Biogen hoped would replace the drug Heparin in the treatment of cardiovascular disease. As one of Biogen's two key proprietary drug candidates, Hirulog was projected to serve a market worth hundreds of millions of dollars per year and, by all accounts, was key to the company's strategy for future growth.

In an effort to obtain Food and Drug Administration ("FDA") approval of Hirulog, Biogen conducted various tests of the drug, called Phase II and Phase III studies. Phase II studies are controlled clinical trials involving a limited population, usually no more than several hundred subjects, with the disease or condition for which the drugs would be preliminarily marketed. Phase II studies generally last from several months up to two years and are designed to determine the dose-response relationship of a drug for a given target population.

Phase III studies, often called "pivotal" trials, usually include from several hundred to several thousand subjects and provide additional information about effectiveness and safety, and an adequate basis for physician labelling. Phase III tests generally last from one to four years.[2] At the time Hirulog was undergoing clinical trials, the FDA generally required two successful Phase III clinical trials as a condition for approving a new drug.

### B. *TIMI–7 Protocol*

In May 1992, Biogen began TIMI–7, a Phase II clinical trial comparing four doses of Hirulog in patients with unstable angina. "TIMI" is the acronym for the Thrombolysis in Myocardial Infarction (TIMI) Trial. The study was conducted by the TIMI office of the National Heart, Lung and Blood Institute, not Biogen. The purpose of TIMI–7 was to identify an efficacious dose of Hirulog in the management of unstable angina, which could then be used in at least one larger Phase III trial (to be called "TIMI–8") comparing Hirulog against Heparin in the treatment of unstable angina. Angina is chest pain caused by blood clots obstructing the flow of blood. When the frequency of angina becomes greater and more unpredictable, the condition worsens to unstable angina, which carries with it an increased risk of heart attack.

At the same time, Biogen began conducting two large Phase III trials testing Hirulog

10(b) by prohibiting fraudulent conduct and misrepresentations and omissions of material facts in the purchase or sale of securities. Section 20(a) of the 1934 Act, codified at 15 U.S.C. § 78t(a), establishes joint and several liability for persons who control any other person liable under the securities laws.

**2.** At the conclusion of a Phase III study, an applicant files a New Drug Application ("NDA") for a "drug" with the FDA which, in turn, is reviewed by an outside committee that recommends whether the drug should be approved for marketing. Of 100 drugs for which new drug applications are submitted to the FDA, about 33 of the original 100 will complete Phase II and go to Phase III trials; and about 25 to 30 of the original 100 will successfully complete Phase III trials. On average, about 20 of the original 100 will be approved for marketing.

in patients undergoing angioplasty ("angioplasty trial").

To ensure against bias, the TIMI–7 protocol set forth prospectively-defined primary and secondary endpoints, using double-blinded, randomized data. The primary prospectively-defined endpoint was a composite endpoint called "unsatisfactory outcome," defined to include any of four adverse events: (1) death, (2) myocardial infarction ("MI"), (3) failure-of-initial therapy, and (4) rapid clinical deterioration. Twenty-four secondary endpoints also were prospectively defined. Patients in the study were divided into four groups, each receiving a different dose of Hirulog. The data from the four groups were then compared at 72 hours following the start of treatment and at six weeks after the start of treatment.

## C. TIMI–7 Results

By early September, 1993, Biogen officials learned that the TIMI–7 trial had failed to show efficacy at its primary and secondary endpoints. That is, there was no statistical difference in outcomes across doses, as measured by the pre-determined primary and 24 secondary endpoints.

Nonetheless, the principal investigators, including Dr. Eugene Braunwald, the chair, "scrubbed" the TIMI–7 data looking at it from every possible angle to see how it could help Biogen take the next step. Braunwald is a well known cardiologist at Brigham & Women's Hospital, who is chair of the Department of Medicine of the Harvard Medical School. This retroactive analysis showed that death or nonfatal myocardial infarction ("MI") was less in the group of patients who received the higher three doses of Hirulog when compared with those who received the lowest dose.

On December 23, 1993, Biogen reported the results of TIMI–7 to Dr. Stephen Fredd, Director of the FDA's Gastrointestinal & Coagulation Drugs Division, in a confidential letter explaining that TIMI–7 had failed to show statistically significant evidence that in-

creased doses of Hirulog achieved improved results over Heparin as measured by the primary endpoint of the study. Biogen also submitted to the FDA a protocol for TIMI–8, a proposed Phase III trial to compare the efficacy of Hirulog to Heparin "by the occurrence of death or non-fatal MI from randomization to hospital discharge." By December 1993, Biogen was considering not proceeding with TIMI–8 if the FDA did not agree at a meeting to occur in February that TIMI–8 could be used as the basis for registration for a NDA without a second Phase III trial.

On February 4, 1994, Biogen representatives met with Dr. Fredd, of the FDA, to discuss the results of TIMI–7 and the proposed TIMI–8 protocol.[3] Dr. Fredd warned that the lack of a statistical difference between the various dose groups with respect to the primary endpoint of the TIMI–7 study "raises concern regarding the efficacy of [Hirulog]." Nonetheless, the FDA encouraged Biogen to embark on TIMI–8, a larger, $25 million Phase III follow-up clinical trial, designed to compare Hirulog against Heparin in the treatment of unstable angina. The FDA never actually promised that TIMI–8 would suffice for an NDA application. At $25 million, TIMI–8 was to be the most expensive clinical trial in the company's history.

## D. Biogen's Public Statements Regarding TIMI–7 Results

### 1. January 11, 1994 Statement

On January 11, 1994, defendant Vincent, who then knew about the TIMI–7 primary endpoint failure and the concerns about an unfavorable decision by the FDA, gave a presentation at Hambrecht & Quist's ("H & Q") annual Life Sciences Conference in San Francisco. He stated: *"Clinical trial results to date encourage us to believe that Hirulog can do much better"* than Heparin. (Emphasis added). He added:

> [T]hroughout all our Phase II and Phase III studies, Hirulog continues to show an impeccable safety profile ... You'll hear the results of the *pivotal* TIMI–7 trial in

---

**3.** Biogen officials at the meeting included Biogen's Director of Clinical Research, Vice President for Regulatory Affairs, and Vice President for Medical Affairs.

unstable angina this March at the American College of Cardiology meetings. *What we've seen to date looks very good.* We also have had good results from the preliminary Phase II trials of Hirulog as an adjunct to thrombolytic drugs during heart attacks in progress.... Biogen is moving full speed ahead on Hirulog. We have manufacturing under control and a marketing strategy in place. *We believe that given positive clinical results we have a very large potential market for the drug.*

(emphasis added). The price of Biogen common stock went up 12 per cent on January 11, 1994, the day of Vincent's remarks, on extremely heavy volume. Later that evening, a First Boston report stated: "First, we expect that the Phase III data on the use of Hirulog in unstable angina patients will be released at the American College of Cardiology meetings in March ... We are very optimistic as to the data to be released on Hirulog ..." In subsequent days, a number of securities analysts issued favorable reports on Biogen based on the expectation of positive data at the ACC. Although none of these reports alluded directly to Vincent's remarks, many of them did make specific reference to the anticipated release of data from TIMI–7 and the potential use of Hirulog in the treatment of unstable angina.

Sometime thereafter, but before the March 14, 1994 press release discussed below, some stock analysts learned from other sources of the failure of TIMI–7 with respect to its primary endpoints.

### 2. *February 1994: ACC Abstract*

Between September 1993, when Biogen officials first obtained the results of TIMI–7, and February, 1994, no information was re-

leased to the public regarding TIMI–7 results. Nonetheless, on or before September 10, 1993, Biogen officials in charge of the Hirulog program, including defendant Vincent, approved the submission of an abstract to the American College of Cardiology ("ACC"), which was published in February, 1994. The abstract noted that:

For purposes of analysis, comparisons were made between the lowest dose (Lo $HLOG_1$) and the combination of the 3 higher doses ($HLOG_{2, 3, 4}$). The primary endpoint was "unsatisfactory outcome" defined as any of the following events by 72 hours: death, MI, recurrent ischemic pain at rest with ECG changes, and rapid clinical deterioration.

Death or nonfatal MI was significantly reduced in [patients] treated with $HLOG_{2, 3, 4}$ compared to Lo HLOG 1 at both hospital discharge (... p<0.004) and at 6 weeks (... P<0.013). *Unsatisfactory outcome was not different between dose groups.*

(emphasis added)

The reaction among stock analysts varied widely, with some analysts issuing bullish reports and others bearish. On the bullish side, for example, analyst David Molowa, of Bear, Stearns & Co., noted on February 28, 1994, that while Hirulog did not demonstrate efficacy at its primary endpoint, "this should not have a negative impact on Biogen's ability to gain regulatory approval." Similarly, analysts Teena Lerner of Lehman Brothers and Anthony Butler of Raymond James issued reports acknowledging the failure of TIMI–7 to reach its primary endpoints, but reiterating their recommendation to "buy" Biogen stock.[4]

---

4. Both Butler and Lerner acknowledged the failure of TIMI–7 to reach its primary endpoints.

Butler noted that "The results indicate that unsatisfactory outcome was not different between the dose groups. However, the data did demonstrate that Hirulog appears to be well tolerated ... and in the higher dosed combination significantly improved the outcome of the most clinically relevant parameters, death and nonfatal myocardial infarction.... We do, however, await the results of TIMI–8. In conclusion, we believe that data on TIMI–7 are very positive for safety and support efficacy to the point of purs-

ing [sic] additional phase III trials." (Lange Aff. Exh. 21, Docket No. 132.)

Lerner, in a report entitled, "Misplaced Concern on Phase II Study," also acknowledged the failure of TIMI–7 to reach its primary endpoint, adding "... the results did not show any difference in dose groups, hence the concerns." Nonetheless, she concluded that "[w]e think it is quite encouraging that Hirulog could affect an improvement in the worst of the possible "unsatisfactory outcomes"—i.e. death and heart attack." (Lange Aff. Exh. 21, Docket No. 132.)

Other analysts, including Eric M. Hecht, of Morgan Stanley, and Jeffrey R. Swarz, of CS First Boston, issued negative reports regarding TIMI–7. Hecht faulted TIMI–7 because, among other things, "[t]he primary endpoint of all unsatisfactory outcomes did not demonstrate any difference between study groups." Additional bearish news was delivered to the market on March 2, 1994, when the Dow Jones News Service issued the following report:

New York—Shares of Biogen Inc. (BGEN) have come under renewed selling pressure this morning after another biotechnology analyst expressed concern about new clinical data on the company's lead product candidate Hirulog.

CS First Boston analyst Jeffrey Swarz downgraded his investment opinion on Biogen to "hold" from "buy" this morning citing his disappointment with the data, which he reviewed via a scientific abstract. Swarz's comments sent the stock down as much as 2 to 40 1/2 in early NASDAQ trading.

Yesterday, as reported, Morgan Stanley's Eric Hecht issued similar words of caution on the recently completed Phase III study. Biogen's shares skidded 3.1%, or 1 3/8, following his evaluation of the finding.

"The data wasn't as encouraging as I would have hoped," Swarz said this morning. "I was hoping to get a clearer picture on Hirulog from the trial."

The First Boston analyst faulted the study for failing to demonstrate the cardiovascular drug's efficacy on its primary focus, which comprised a variety of events including death, nonfatal heart attack and rapid clinical deterioration.

The price of Biogen's common stock fell 8.25% between the weeks of February 22—28, 1994 and March 1–7, 1994.[5]

### 3. *March 14, 1994 Press Release*

At the March 14, 1994 ACC Conference, Dr. Joanna Fuchs of the TIMI Study Office presented the results of TIMI–7 clinical trials, including both the primary endpoint failure and the reduction in the incidence of death and non-fatal heart attacks. That same day, Biogen also issued a press release stating that Hirulog reduced death and non-fatal heart attacks in patients participating in the TIMI–7 trial. The press release described TIMI–7 as a "randomized, double-blind, dose-ranging study." It also stated that Hirulog would next be studied in a second larger trial known as TIMI–8 "which is designed to compare its efficacy against Heparin in the management of unstable angina." In the press release, Vincent stated:

We are encouraged by the results of TIMI–7, which showed a significant reduction in death and heart attacks among patients treated with Hirulog. The study once again confirmed Hirulog's outstanding safety profile, with less than half a percent of patients experiencing bleeding complications.[6]

On March 15, 1994, the Dow Jones News Service reported that Biogen shares fell a further 7%, to 38 1/2.

### E. *Mislabeling of TIMI–7 as a Phase III Study*

Although TIMI–7 was a Phase II dose-ranging study, Biogen officials, at times throughout 1992 and 1993, described the study as a Phase III or "pivotal" trial. For example:

"The TIMI–7 trial was designed to study 'unsatisfactory outcome,' a broad term that included death, heart attacks, recurrent chest pain while at rest and rapid clinical deterioration," Mr. Vincent said. *"While we did not achieve this broad composite endpoint,* TIMI–7 showed significant reduction in the two most critical endpoints."* (Lange Exhibit 9–C/Hedison Exhibit 8, Docket No. 144.)

The emphasized language did not appear in the press release that was issued to the public.

---

**5.** Torkelsen notes that the 8.25% decline in Biogen's common stock was not due to market-wide or industry factors, since during the same time period the S & P 500 declined only slighted by 0.67% and the NASDAQ Pharmaceutical Stocks declined only 1.19%. The Dow Jones News Service reported on March 1, 1994, however, that shares of Biogen common stock fell 3%, to 42 1/2.

**6.** A *draft* of the March 14, 1994 press release quoted Vincent as follows:

A June 5, 1992 Biogen press release stated that Vincent had announced that "phase III clinical trials have begun to study Hirulog (tm) as a potential treatment for unstable angina."

A November 16, 1992 Biogen press release stated that: "Biogen is currently conducting a Phase III trial of Hirulog for the treatment of unstable angina and expects to begin a Phase III trial for a second indication in early 1993."

Vincent stated at the annual H & Q Life Sciences Conference in January 1993 that: "In June we began our first Phase III trial in unstable angina called TIMI—7, six months ahead of schedule."

On September 21, 1993 the *Dow Jones News Wire*, based upon statements made by Biogen Vice President Kenneth Bate, reported that "Phase III trials of Hirulog are ongoing for angioplasty and unstable angina."

The misperception that TIMI–7 was a Phase III trial was reflected in at least two analysts' reports.[7] In addition, materials about Biogen distributed in connection with the January 11, 1994 H & Q annual Life Sciences Conference, at which defendant Vincent spoke, mislabeled TIMI–7 as a Phase III trial. Likewise, in his January 11, 1994 speech, Vincent described TIMI–7 as a "pivotal" trial, a term often used to described Phase III trials. By February 16, 1994, and no later than March 2, 1994, the market understood that TIMI–7 was a Phase II trial.

F. *Events After March 14, 1994*

On May 12, 1994, Fredd wrote Biogen a letter reiterating his concerns about the efficacy of Hirulog, but also discussing future plans for TIMI–8, a Phase III unstable angina study in which Biogen would invest some $25 million.

On July 26, 1994, Biogen announced that it had completed the treatment of its Phase III angioplasty trials. for Hirulog, which were distinct from both TIMI–7 and TIMI–8. However, no information regarding the results of the angioplasty trials was released at

that time. During August or September 1994, Biogen began considering termination of TIMI–8 if the Phase III angioplasty trial results were not positive.

On October 7, 1994, Biogen had preliminary analyses of the data from the Phase III angioplasty trial which showed that the trial failed at its primary endpoint. Earlier that morning, before he had the bad news, Biogen's President, James Tobin, had spoken with a *Reuters* reporter about Biogen's plans to file for FDA approval for Hirulog in 1995. The article appeared on October 11, 1994. On October 14, 1994, Biogen had definitive results, and on October 23, 1994, senior Biogen officials decided to discontinue the Hirulog development program.

The disappointing test results from the angioplasty trials were released on October 31, 1994, when Biogen announced that, as a result of its analysis of the angioplasty trials, it was abandoning its efforts to develop Hirulog as a proprietary drug. Biogen officials had hoped to finance TIMI–8 with proceeds from the development of Hirulog in the treatment of angioplasty. Thus, when the angioplasty studies failed, Biogen discontinued TIMI–8 as well. In an October 30, 1994 letter to Dr. Eugene Braunwald informing him of the decision to discontinue TIMI–8, Dr. Irving Fox explained: "At the start of the trial, it was recognized that there was a substantial risk in trying to prove Hirulog superior to Heparin." Braunwald—whom defendants repeatedly describe as "no friend of Biogen"—believed that the TIMI–7 trial was successful "where it mattered" and it was an "unwise decision" to stop TIMI–8.

Biogen announced that it was taking a $25 million pretax charge to earnings in the third quarter of 1994 associated with the manufacturing of drug supplies and the wind down of Hirulog clinical trial activities. Biogen emphasized that it would seek a marketing partner with which to license Hirulog. The stock price of Biogen dropped almost 20 per cent in one day, principally as a result of Biogen

---

7. *See eg.* Molowa Ex. 9 (Bear Stearns First Call report Nov. 8, 1993) and Ex. 11 (Feb. 16 1994); Swarz Ex. 9 (Nov. 12, 1993 First Boston Morning Call report); Ex. 12 (Nov. 11, 1993), Ex. 10 at pp. 992, 1008 (Jan. 3, 1994) Ex. 11 (January 11, 1994).

discontinuing the Hirulog development program for unstable angina.

## II. *DISCUSSION*

Plaintiffs allege that Defendants' January 11, 1994 and March 14, 1994 statements misrepresented the prospects for Hirulog and constituted securities fraud under Section 10(b) and Rule 10(b)—5.[8] Defendants move for summary judgment under Fed.R.Civ.P. 56. Plaintiffs oppose summary judgment and move for class certification pursuant to Fed.R.Civ.P. 23.[9]

### A. *Summary Judgment*

The purpose of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). A court must allow a motion for summary judgment when the record, viewed in the light most favorable to the nonmoving party, reveals no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Fed. R.Civ.P. 56. The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party, which "cannot fend off summary judgment unless it makes a competent demonstration that *every essential element* of its claim or defense is at least trialworthy." *Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir.1991).

In securities litigation, plaintiffs may defeat summary judgment "only be showing a genuine issue of fact with regard to a particular statement by the defendant corporation or its insiders." *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1118 (9th Cir.1989), *cert. denied* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

### 1. *Elements of a Rule 10b–5 Claim*

To prevail in a Rule 10b–5 claim, a plaintiff must establish that (1) the defendant made a materially false or misleading statement or omitted a material fact necessary to make a statement not misleading; (2) that the defendant acted with scienter; and (3) that the plaintiff's reliance on the defendant's misstatement caused his injury. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996).

Where, as here, the plaintiffs assert a material omission by the defendants, the plaintiffs first must show that the defendants had a duty to disclose the information. Although "[s]ilence absent a duty to disclose, is not misleading under Rule 10b–5," *Basic Inc. v. Levinson*, 485 U.S. 224, 239, n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), "even a voluntary disclosure of information that a reasonable investor would consider material must be 'complete and accurate.'" *Backman v. Polaroid Corp.*, 910 F.2d 10, 13 (1st Cir. 1990) (en banc) (quoting *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir. 1987).)

A speaker also has a "duty to correct" misinformation when a disclosure is, in fact, misleading when made. *Backman*, 910 F.2d at 16–17. The First Circuit Court, however, has rejected a duty to "correct" an optimistic report with negative information acquired after the issuance of the report so long as the initial report was "precisely correct" when issued and remained so thereafter. *Id.*

Of course, some statements, "although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For

---

8. In its January 22, 1996 order, this Court dismissed most of plaintiff's claims, leaving at issue only the January 11, 1994 statement by Vincent at the H & Q Conference and the March 13, 1994 press release issued by Biogen regarding the TIMI–7 trial outcome.

9. Plaintiffs' have not alleged in their second amended complaint that Biogen's mischaracterization of TIMI–7 as a Phase III, rather than a Phase II, trial constituted fraud and they will not be allowed to do so at this late date.

that reason, the disclosure required by securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Lucia v. Prospect Street High Income Portfolio*, 36 F.3d 170, 175 (1st Cir. 1994) (citing *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990), *cert. denied*, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991)).

▮ A showing of materiality on summary judgment thus depends on whether the plaintiffs could persuade a "reasonable juror to find that a reasonable investor would view information allegedly withheld by defendants as significantly altering the total mix of available information to investors." *Rand v. Cullinet Software, Inc.*, 847 F.Supp. 200, 204 (D.Mass.1994) (quoting *Steiner v. Tektronix, Inc.*, 817 F.Supp. 867, 882 (D.Or.1992)). *See also Ansin v. River Oaks Furniture, Inc.*, 105 F.3d 745, 754 (1st Cir.1997) (holding that "information is material if there is a reasonable likelihood that a reasonable investor would consider it important.") (quoting *Glassman v. Computervision Corp.*, 90 F.3d 617, 632 (1st Cir.1996)), *cert. denied*, — U.S. —, 118 S.Ct. 70, 139 L.Ed.2d 31 (1997); *Milton v. Van Dorn*, 961 F.2d 965, 969 (1st Cir.1992) ("information is material only if its disclosure would alter the 'total mix' of facts available to the investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision.") (quoting *Basic*, 485 U.S. at 231–232, 108 S.Ct. 978.)

▮ The determination of materiality "is normally a jury question and should not be taken from it unless the court has engaged in meticulous and well articulated analysis of each item of withheld or misrepresented information," *Lucia*, 36 F.3d at 176. *See also Ansin*, 105 F.3d at 754 ("This court has repeatedly held that the question of the materiality of omitted information is one peculiarly for the trier of fact.") Summary judgment is warranted, nonetheless, "if reasonable minds could not differ as to the materiality of undisclosed information." *Milton*, 961 F.2d at 970. *See also Shaw*, 82 F.3d at 1217–18 ("courts have demonstrated a willingness to find immaterial as a matter of

law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace … [such that] no reasonable investor could find them important to the total mix of information available.")

▮ In addition, the plaintiffs have the burden of showing scienter, that is, that the statements or omissions were made with "an intent to deceive, manipulate or defraud." *Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Alternatively, the First Circuit has "assumed, without deciding, that recklessness amounting to indifference is an acceptable substitute." *Rand*, 847 F.Supp. at 204 (citing *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 516 (1st Cir.1978)); *see also First Commodity Corp. v. Commodity Futures*, 676 F.2d 1, 7 (1st Cir.1982) (characterizing reckless misrepresentation as "one that departs so far from the standards of ordinary care that it is very difficult to believe that the speaker was not aware of what he was doing."); *Estabrook*, 587 F.2d at 516 (requiring the plaintiff to show "carelessness approaching indifference.").

▮ Finally, the plaintiffs who bring Rule 10b–5 claims must show reliance on the material misrepresentation or omission. *Rand*, 847 F.Supp. at 204–05. In the alternative, plaintiffs are entitled to a rebuttable presumption of reliance based on the fraud-on-the-market theory, if they can show that "materially misleading statements were disseminated into 'an impersonal, well-developed market for securities.'" *In re One Bancorp Securities Litigation*, 136 F.R.D. 526, 529 (D.Me.1991) (quoting *Basic*, 485 U.S. at 247, 108 S.Ct. at 991). *See also In re Apple Computer*, 886 F.2d at 1113–14. Defendants can rebut the presumption if they show that "the market price was not affected by their misrepresentations or that the Plaintiffs did not trade in reliance on the integrity of the market price." *In re One Bancorp Securities Litigation*, 136 F.R.D. at 529 (citing *Basic*, 485 U.S. at 248, 108 S.Ct. at 992).

### 2. *Alleged Misleading Statements*

#### a. *January 11, 1994 Statement*

▮ Plaintiffs allege fraud based on the statements by Vincent at the January 11,

1994 H & Q conference that the results of the *"pivotal* TIMI–7 trial" encouraged Biogen, that "what we've seen to date looks good" and that "we believe that given positive clinical results we have a very large potential market for the drug."

Defendants contend that there is no evidence that Vincent's remarks entered the market and that, in any event, the plaintiffs have failed to show that defendant Vincent acted with the requisite scienter in making his January 11, 1994 remarks.

When the record is viewed in the light most favorable to the plaintiffs, a reasonable jury could conclude that the January 11, 1994 statement portraying TIMI–7 as a successful trial significantly altered the total mix of information then available on the market. Although the plethora of analysts reports issued on the evening of January 11 and in the days following did not specifically reference Vincent's remarks, they echoed Vincent's upbeat predictions and specifically referred to the expected release of positive TIMI–7 data in March. The price of Biogen stock went up 12 percent. Because Vincent's remarks were the only information on the market regarding TIMI–7 results at that time, a jury could reasonably infer that the Vincent's remarks had, indeed, entered the market.

Pointing to Vincent's affidavit, in which he says he made the statements in good faith, and Biogen's actual commitment of $25 million to TIMI–8, Biogen contends that plaintiffs have failed to produce "affirmative evidence" of scienter, such as a financial motive to be an insider trader or announcement of a new public offering. Although the issue is close, a reasonable jury could find evidence of scienter, at least sufficient to surmount the recklessness threshold, in light of Vincent's actual knowledge that TIMI–7 had not reached its primary endpoint and Biogen's concerns about the FDA's response to the shortcomings of TIMI–7. At a minimum, Vincent was fully aware of undisclosed facts tending to seriously undermine the optimism of his statement on January 11, 1994. *See Kaplan v. Rose,* 49 F.3d 1363, 1375–80 (9th Cir.1994) (failing to disclose known disappointing trial results while releasing positive

statements regarding product was sufficient evidence of scienter to raise genuine issue of material fact on summary judgment), *cert. denied sub nom., Payne v. Kaplan,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995). *See also Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995) (holding that where plaintiff cannot establish either "a motive to commit fraud or an opportunity to do so" or "circumstantial evidence of either reckless or conscious misbehavior" securities claims must be dismissed); *In re: Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1422 (3d Cir.1997) ("To satisfy scienter requirement, plaintiffs must allege facts that give rise to an inference that [defendant] knew or was reckless in not knowing" that his statements were false).

Finally, with regard to reliance, the plaintiffs contend that they were induced to purchase Biogen stock not based on direct reliance on any particular statements made by Biogen officials, but by the artificially inflated stock price set by the market in light of official Biogen statements and omissions, as well as other information available to the market. *Cf. In re Apple Computer,* 886 F.2d at 1114. Evidence that Vincent's remarks led to the inflation of Biogen stock prices includes the fact that the price of Biogen common stock rose 12 percent the day after Vincent's remarks, amid reports by stock analysts discussing Hirulog and the anticipated March release of TIMI–7 results.

b. *The ACC Abstract and March 14, 1994 Press Release*

Defendants contend that publication of the ACC abstract in February 1994, combined with the March 14, 1994 press release and subsequent public reports by stock analysts and wire services was sufficient to "cure" whatever misinformation allegedly entered the market with regard to the results of TIMI–7.

This "truth on the market" defense—that the market already had the full force of negative information regarding TIMI–7 by mid–March—is intended to rebut the plaintiff's presumption of reliance on the market by suggesting that "even if fraudu-

lent statements were made in attempt to manipulate the market price of a security, if corrective information 'credibly entered the market and dissipated the effects of the misstatements, those who traded [defendant's] shares after the corrective statements would have no direct or indirect connection with the fraud.' " *Rand,* 847 F.Supp. at 205 (quoting *Basic,* 485 U.S. at 249, 108 S.Ct. 978).

In general, a truth on the market defense is a fact-intensive inquiry. *See Schaffer v. Timberland Co.,* 924 F.Supp. 1298, 1309 (D.N.H.1996) ("truth on the market defense presented by the defendants necessarily involves a fact-intensive inquiry which is illsuited to a motion to dismiss."); *In re Taxable Municipal Bonds Litigation,* 1994 WL 532079, *3 (E.D.La.1994) (noting that determination of truth on market defense is "fact intensive and, therefore, the defendants have an onerous burden on summary judgment .")

■ Nonetheless, summary judgment may be appropriate in cases involving curative disclosures where, in view of the information in the market from all sources, a reasonable jury could not conclude that any misconduct by the defendant was material. *See Rand,* 847 F.Supp. at 206. *See also In re Apple Computer,* 886 F.2d at 1111–12 (granting summary judgment when "at least twenty articles stressed the risk [defendant] was taking, and detailed the underlying problems producing those risks ... the market could not have been more aware of [the new product's] risks."). *See also Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1262 (4th Cir.1993) (granting summary judgment against claims after date on which it determined market was fully informed of relevant information); *Fine v. American Solar King Corp.,* 919 F.2d 290, 299 (5th Cir.1990) ("presumption of reliance can be rebutted by showing ... that the nondisclosures did not affect the market price."), *cert. dismissed sub nom., Hurdman v. Fine,* 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991).

The defendants contend that the ACC abstract revealed the failure of TIMI–7 to meet its primary endpoint when it stated that "unsatisfactory outcome was not different between dose groups." It is undisputed that this information entered the public domain, was discussed by securities analysts in their reports, and was reflected in the drop in the price of Biogen common stock. As a result, defendants contend, the plaintiffs cannot prove that Biogen's statements in early 1994 were the proximate cause of the November 1, 1994 decline in the value of Biogen stock.

Plaintiffs respond that both the ACC abstract and the press release failed to cure the alleged fraud on the market, and, indeed, perpetuated the fraud, because they were misleading in four ways discussed below.

#### i. *Fredd's Reservations*

■ The plaintiffs contend that the February abstract and the March 14, 1994 press release were misleading because they did not disclose concerns about the efficacy of the drug expressed on February 4, 1994 by Dr. Fredd, the director of the responsible FDA division. The testimony of Bear Stearns analyst, David Molowa, supports the contention that FDA concerns regarding the efficacy of a new drug under development is information that would be material to the market.

Defendant contends it had no legal duty to disclose Fredd's reservations and such information is not publicly available to the market. Biogen had no duty to disclose Fredd's reservations. *In re Medimmune, Inc. Securities Litigation,* 873 F.Supp. 953, 966 (D.Md.1995) ("Defendants, as a general proposition, ha[ve] no duty to report [their] ongoing discussions with FDA during the review process.") Indeed, as the *Medimmune* court explained, the danger of "requiring ongoing disclosure of FDA's questions [is that it] would not only be disruptive to the review process; it could easily result in misleading the public more than not reporting the questions. Where mere disclosure of a question might cause the company's stock to decline in value, the eventual answer to the question might cause it to rise once again." *Id.* at 966.

#### ii. *Retrospective Analyses*

■ The plaintiffs allege that Biogen perpetuated the fraud by heralding the success of TIMI–7 in achieving the combined endpoints of death and MI, while failing to in-

form the market that this combined endpoint was retrospective, based on a "enormous number of analyses" performed on the TIMI–7 data after the data was unblinded.

The alleged omissions raise the issue of whether the defendants abrogated their duty to avoid incomplete and half-true misleading statements. *Backman*, 910 F.2d at 16–17. *See also In re Apple Computer*, 886 F.2d at 1116 ("any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations.") To be sure, the abstract and press release put a positive spin on TIMI–7 by hailing the reduction "of death and myocardial infarctions in patients treated with higher doses" of Hirulog, and calling the results of TIMI–7 "encouraging," without also fully discussing the limitations of those findings.

Plaintiff fail to produce sufficient evidence from which a jury could make a finding of scienter with regard to Biogen's omission of the fact that the combined endpoint of death and nonfatal heart attack was retrospectively defined. By all accounts, scientists working for the TIMI office and Biogen were genuinely enthusiastic about the results of TIMI–7 with regard to the retrospectively-defined endpoint of death and non-fatal heart attacks. Based on these results, Biogen decided to go full-bore ahead with TIMI–8. Dr. Eugene Braunwald, the Chairman of the TIMI study, whom plaintiffs called as a witness, testified that the retrospective scrubbing of clinical trial data is not only acceptable, but "part of the due diligence in looking at data." Braunwald further testified that while death and non-fatal heart attack were not listed as a pre-specified secondary endpoint, "[d]eath and MI is a very common analysis. It's one that is clinically, probably the most important one. And that obviously was one that we used and most excitedly found an interesting effect of the drug and that led to the design of TIMI–8." In fact, Braunwald believed that the TIMI–7 trial was successful "where it mattered" and that it was an unwise decision to discontinue TIMI–8. The TIMI team, who were not

Biogen employees, felt that way. Similarly, Dr. Bert Adelman, Biogen's director of medical research, testified that both death and nonfatal MI were defined as prospective endpoints, albeit not in combination, and that he didn't "believe that the protocol can begin to or should state all of the combinations of analyses that may be done upon individual measurements that were prospectively defined in the protocol."

Given the split of expert opinion regarding the importance of prospectively defined endpoints, the plaintiffs cannot demonstrate either fraudulent intent or recklessness in Biogen's failure to fully publicize the TIMI–7 methodology. *See In re: Medimmune, Inc.*, 873 F.Supp. at 966 (holding that plaintiff's claim as to the theoretical invalidity of test data falters on the issue of scienter when "[m]edical researchers may well differ over the adequacy of given testing procedures and in the interpretation of test results.") *See also Padnes v. Scios Nova Inc.*, 1996 WL 539711 at * 5 (N.D.Cal.1996) (holding that securities laws do not require "that companies who report information from imperfect studies include exhaustive disclosures of procedures used, including alternatives that were not utilized and various opinions with respect to the effects of these choices on the interpretation of the outcome data.")

As important, plaintiffs have failed to produce any credible evidence that the failure to disclose the retrospective nature of the evaluation of endpoints undermined the curative statements. The plaintiffs' key evidence in support of their argument of materiality on the TIMI–7 methodology is a showing that, at the time of his deposition, Molowa, the Bear Stearns analyst, "*still* believed that death and MI combined was a *prospectively* secondary endpoint." Molowa, however, also testified that it would have made no difference to his bullish assessment of Biogen stock if he had known that this combined endpoint was not prospectively defined in the protocol. Therefore, plaintiffs cannot show that Biogen's omission regarding the retrospective nature of the findings would have altered the total mix of information available to the reasonable investor.

### iii. *Secondary Endpoints*

The plaintiffs contend that ACC abstract and press release perpetuated the fraud by failing to reveal that TIMI–7 failed to meet any of its 24 pre-defined secondary endpoints. To begin with, plaintiffs have not asserted in the complaint that Biogen's failure to publicize that TIMI–7 met none of the 24 secondary endpoints constituted securities fraud. Such an omission may be allowed in, however, as evidence of lure to effectuate a cure of the fraud.

Once again, plaintiffs have produced no evidence of scienter for the reasons stated with respect to the "retrospective analysis." Nor is there any evidence that the additional information regarding secondary end points would have materially altered the mix of information available to the reasonable investor. Although *Backman* requires that a company provide complete and accurate information, this does not "mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only that such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'" *Backman*, 910 F.2d at 16 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968), *cert denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)).

The undisputed evidence demonstrates that the most relevant and disappointing aspect of the TIMI–7 results—the failure to reach the primary endpoint—entered the marketplace. Key analysts downgraded Biogen stock upon receiving the ACC abstract and March 14, 1994 press release, stating publicly that they did so, at least in part, as a response to the failure of TIMI–7 to meet its primary endpoints. Even those who remained bullish on Biogen stock stated in public reports that they were aware that TIMI–7 did not demonstrate efficacy at its primary endpoint. The three to seven percent drop in the price of Biogen common stock upon the publication of the ACC abstract, and the additional 8.25 percent drop in the stock price following the March 14, 1994 press release, suggests that the market corrected for allegedly misleading impression left by Vincent's January 11, 1994 "unabashedly upbeat" statement. To be sure, stock price correlations, alone, may be insufficient, as a matter of law, to support summary judgment in a truth on the market defense. *See Basic*, 485 U.S. at 249, n. 28, 108 S.Ct. 978 ("by accepting this rebuttable presumption [of fraud on the market], we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.") Nonetheless, the fall in Biogen stock prices, when combined with reports of security analysts discussing the failure of TIMI–7 to meet its primary endpoints and the subsequent uncertainties that analysts publicized about the future of Hirulog, suggests that any additional disclosure by Biogen regarding the TIMI–7 methodology would not have altered the total mix of information available to the reasonable investor of Biogen stock.

Finally, the plaintiffs have not introduced any evidence that omissions in the abstract and press release were the proximate cause of the drop in the price of Biogen stock in October, 1994. The plaintiffs own expert, John B. Torkelsen, testified that "[t]he decline in Biogen's stock price after October 31, 1994 announcement was principally a result of Biogen discontinuing the Hirulog development program." Because the plaintiffs cannot demonstrate loss causation, any alleged omissions in the ACC abstract and March 14, 1994 press release are so attenuated from the alleged harm as to be immaterial as a matter of law. *See Shaw*, 82 F.3d at 1210–11 ("In many circumstances, the relationship between nonpublic information that plaintiffs claim should have been disclosed and the actual results or events that the undisclosed information supposedly would have presaged will be so attenuated that the undisclosed information may be deemed immaterial as a matter of law.") (citations omitted).

### iv. *The Decision to Terminate*

Plaintiffs contend that Biogen fraudulently failed to disclose that it was considering terminating the TIMI–8 trial if the results of the Phase III angioplasty study were not positive. However, a duty to disclose

does not arise from the mere possession of non-public market information. *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Absent a misleading prior disclosure, there is no duty to disclose internal business strategy. *Roeder*, 814 F.2d at 27.

**B. *Class Certification***

Plaintiffs move for certification of a class consisting of persons who purchased Biogen common stock during the period from January 11, 1994 through and including October 31, 1994 and who sustained damages as a result.[10]

Fed.R.Civ.P. 23(a) sets forth four prerequisites for class certification: adequacy of representation, numerosity, commonality and typicality. Also, one of the three requirements set forth in Fed.R.Civ.P. 23(b) must be met. *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 305 (D.Mass.1987). Here, the plaintiffs seek to meet Rule 23(b)(3), which requires a finding "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

"The party seeking class certification bears the burden of showing that these requirements have been met." *Kirby*, 116 F.R.D. at 305 (citations omitted).

**1. *Adequacy***

 Defendants argue that Sheila Gralish, the named plaintiff representative, is not an adequate representative because of her alleged lack of familiarity with the case and her unwillingness to incur more than $500 of class expenses. Gralish, a retired bank officer from Seattle, Washington, purchased 100 shares of stock at $49—1/2 share on January 24, 1994 and sold her shares on March 23, 1994 at $37—3/4. Her total loss was $1,100. She purchased the shares in consultation with a financial advisor who relied on the

promising reports of the Hirulog clinical trials. After reviewing Gralish's deposition, the Court finds that she is an adequately knowledgeable about the case to represent the class. *See Adair v. Sorenson*, 134 F.R.D. 13, 19 (D.Mass.1991) (holding that a class representative "need not have knowledge of all the relevant facts to be an adequate representative."); *In re Newbridge Networks Securities Litigation*, 926 F.Supp. 1163, 1177 (D.D.C. 1996) ("[I]n complex litigation such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative and a great deal of reliance on the expertise of counsel is to be expected.") (quoting *In re AM Int'l Securities Litigation*, 108 F.R.D. 190, 196–97 (S.D.N.Y.1985).)

Likewise, Gralish testified that she would be able and willing to shoulder costs of $200 to $500 in litigation expenses—between 20 percent and 50 percent of her $1,000 investment in Biogen stock. *See In re Bank of Boston Securities Litigation*, 762 F.Supp. 1525, 1535 (D.Mass.1991) (finding a representative adequate upon showing that the named plaintiff would agree to be personally responsible for payment of his share of costs and expenses of litigation).

The other proposed class representations are not adequate because they purchased after March 14, 1994 which is the latest date by which the primary endpoint failure was unknown to the market.

**2. *Numerosity and Commonality***

The defendants do not dispute that the plaintiffs satisfy the numerosity requirement for certification. Insofar as the Court limits the plaintiffs class, as discussed below, the defendants' arguments regarding alleged conflicts within the class need not be addressed. The plaintiffs have adequately shown common questions of law or fact. The Court, therefore, concludes that the plaintiffs have satisfied these two requirements.

---

**10.** Excluded from the proposed class are the defendants, members of their immediate families, any person, firm, trust, corporation, officer, director or other individual or entity in which

any defendant has a controlling interest, and the legal representatives, heirs and successors or assigns of any such excluded person or entity.

### 3. *Typicality*

Plaintiffs contend that the class period should extend to those members of the class who purchased stock up to October 31, 1994, because the price of Biogen stock remain artificially inflated even after March 14, 1994, due to Biogen's failure to reveal the "whole truth" about the TIMI–7 results and the FDA's concerns about Hirulog's efficacy. Defendants argue that any named plaintiff who purchased Biogen stock after February 28, 1994 fails to meet the typicality requirement of Rule 23, since the TIMI–7 endpoint failure was known to the market at that time.

Generally, a Court does not consider the merits of a claim in determining class certification. *See In re One Bancorp Securities Litigation*, 136 F.R.D. at 530 (the Court "may not consider the merits of the case at the class certification stage."), *citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974); *Randle v. Spectran*, 129 F.R.D. 386, 391 (D.Mass.1988) (holding that it is inappropriate to raise non-reliance at class certification stage); *Shields v. Smith*, 1992 WL 295179 at *5 (N.D.Cal.1992) (holding that it is impermissible for a court, in determining class certification, to resolve factual dispute over whether defendants cured alleged market misperceptions with press release.)

Here, however, the defendants have shown on summary judgment that any possibly misleading information that entered the market due to defendant Vincent's January 11, 1994 statement was cured by March 14, 1994. Because the plaintiffs have met all other requisites under Rule 23, however, the Court certifies a class of persons who purchased Biogen stock during the period from January 11, 1994, the day of Vincent's statement, through and including March 14, 1994, who sold prior to October 31, 1994, and who sustained damages as a result.

### *ORDER*

For the foregoing reasons, the Court *DENIES* the defendants' motion for summary judgment with respect to the defendant Vincent's January 11, 1994 statement and *ALLOWS* the defendants' motion for summary judgment with respect to the ACC abstract and March 14, 1994 press release (Docket No. 127).

The Court *ALLOWS in part* the plaintiffs' motion for class certification, (Docket No. 125) as follows:

All persons who purchased Biogen common stock during the period from January 11, 1994 through and including March 14, 1994 (the "Class Period") who sold after March 14, 1994 but prior to October 31, 1994 and who sustained damages as a result (the "Class"). Excluded from the Class are the defendants herein, members of the immediate family of any defendant, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest, and the legal representatives, heirs and successors or assigns of any such excluded person or entity.

The Court *ALLOWS* the motion to certify Sheila Gralish as a class representative but *DENIES* the motion to certify the other proposed class representatives.